OSCN Found Document:BASE v. DEVON ENERGY PRODUCTION

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 BASE v. DEVON ENERGY PRODUCTION
2024 OK 3
Case Number: 119366
Decided: 02/06/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 3, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

KAYE FRANCES BASE and ARLYN JOE JUSTICE, as Trustees of THE EUNICE S. JUSTICE AMENDED, REVISED AND RESTATED 1990 REVOCABLE TRUST AGREEMENT EXECUTED ON THE 31ST DAY OF JANUARY, 2011, Plaintiffs/Appellants/Petitioners,
v.
DEVON ENERGY PRODUCTION COMPANY, L.P., a domestic limited partnership, Defendant/Appellee/Respondent.
ON CERTIORARI FROM 
THE COURT OF CIVIL APPEALS, DIVISION II
¶0 This oil and gas case involves a dispute over the amount of royalties that Defendant/Appellee/Respondent Devon Energy Production Company, L.P. (hereinafter "Devon") has paid to The Eunice S. Justice Amended, Revised, and Restated 1990 Revocable Trust Agreement Executed on the 31st Day of January 2011 (hereinafter "the Trust") since production commenced in 2017 at nine wells collectively called the Bernhardt Wells. The trustees of the Trust, Plaintiffs/Appellants/Petitioners Kaye Frances Base and Arlyn Joe Justice (hereinafter "Trustees"), allege that the Trust is entitled to recover a [3]/16 royalty under a 1978 Lease executed between everyone's predecessors-in-interest; but Devon alleges its interest arises from an earlier 1973 Lease under which the Trust is only entitled to receive the [1]/8 royalty that it has paid. The Trustees filed suit against Devon in May of 2019, seeking to quiet title in favor of the 1978 Lease and to obtain pursuant to the Production Revenue Standards Act, 52 O.S.2021, §§ 570.1 et seq, both an accounting and a recovery of the [1]/16 difference in royalties that Devon has allegedly underpaid. Nearly a year later, Devon sought summary judgment based on the 15-year statute of limitation found in 12 O.S.2021, § 93(4), arguing that Trustees' quiet title action would have accrued by 1979 and been barred after 1994. The trial court granted Devon's motion for summary judgment and denied Trustees' subsequent motion for new trial. Trustees appealed, and the Court of Civil Appeals (COCA) affirmed by a 2-1 vote. Trustees then sought review on certiorari, arguing COCA failed to follow both this Court's numerous precedents holding there is no statute of limitation on an equitable quiet title claim and this Court's precedent in Claude C. Arnold Non-Operated Royalty Interest Properties v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817, regarding when their claims accrued. We previously issued a writ of certiorari and now vacate COCA's opinion, affirm the trial court's summary judgment, and remand the case for further proceedings not inconsistent with this opinion.
OPINION OF THE COURT OF CIVIL APPEALS VACATED; 
JUDGMENT OF THE DISTRICT COURT AFFIRMED; 
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.
Kraettli Q. Epperson, NASH, COHENOUR & GIESSMANN, P.C., Oklahoma City, Oklahoma, for Plaintiffs/Appellants/Petitioners.
Timothy J. Bomhoff and Laura J. Long, MCAFEE & TAFT, A PROFESSIONAL CORPORATION, Oklahoma City, Oklahoma, for Defendant/Appellee/Respondent.
COMBS, J.:
I. FACTUAL AND PROCEDURAL BACKGROUND
¶1 Plaintiffs/Appellants/Petitioners Kaye Frances Base and Arlyn Joe Justice are co-trustees of a revocable living trust that their mother, Eunice (née Shawver) Justice, originally settled in 1990 but that she amended in 2011 both to add them as her co-trustees and to name them as successor trustees. The name of the trust is The Eunice S. Justice Amended, Revised, and Restated 1990 Revocable Trust Agreement Executed on the 31st Day of January 2011. Eunice died March 30, 2015, at which point Trustees succeeded.
[1]
¶2 This Trust is a successor-in-interest to certain mineral interests in the 80-acre lot contained in the northern half of the northeast quarter of Section 8, Township 15 North, Range 9 West of the Indian Meridian (i.e., N/2 NE/4 of Section 8-15N-9W in abbreviated form) in Kingfisher County, Oklahoma.[2] Back in 1973, those interests were owned by Eunice's mother, Lena Shawver, as life tenant and by Eunice herself as remainderman. On June 16, 1977, Mrs. Shawver conveyed her interests in the land and minerals of the N/2 NE/4 of Section 8-15N-9W to Eunice, thus reuniting the life estate and the remainder.[3]
¶3 On December 4, 1973, Lena Shawver and Eunice Justice executed an oil and gas lease in favor of the Rodman Corporation, a Texas corporation, concerning those mineral interests in the N/2 NE/4 of Section 8-15N-9W (hereinafter "the 1973 Lease").[4] Under its habendum clause, the 1973 Lease would remain valid for a primary term lasting 5 years and then for a secondary term lasting "as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of the products covered by this lease is or can be produced" by a well drilled during the primary term.[5] The 1973 Lease also provided for payment of a one-eighth ([1]/8) royalty to the lessors.[6] Consequently, the Rodman Corporation had until December 4, 1978, to drill a producing well. But on August 1, 1977, the Rodman Corporation assigned its interests as lessee to Partnership Properties Co., a Colorado general partnership.[7] Thus, Partnership Properties Co. had a little over one year left to drill a producing well and thereby hold the 1973 Lease into its secondary term.
¶4 But before a well could be drilled, Eunice and her husband, Herman O. Justice, executed a second oil and gas lease concerning the very same mineral interests on July 24, 1978 (hereinafter "the 1978 Lease") in favor of Petro-Lewis Funds, Inc., a Colorado corporation.
[8] The habendum clause of the 1978 Lease specified that its three-year primary term would commence on December 4, 1978 (i.e., the date that the 1973 Lease's primary term was set to expire):
2. This lease shall remain in force for a term of three (3) years / and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of the products covered by this lease is or can be produced from said land, or from land with which said land is pooled, or operations are being continued as hereinafter provided.

. . . .
5. If operations for the drilling of a well for oil or gas are not commenced on said land or on acreage pooled therewith as herein provided on or before one year from this date, this lease shall terminate as to both parties, unless the lessee shall on or before one year from this date pay or tender to the lessor or for the lessor's credit in the Watonga State Bank Bank at Watonga, Oklahoma 

or its successors . . . the sum of Eighty Dollars & No/100's -------- Dollars ($ 80.00 ), which shall operate as a rental and cover the privilege of deferring the commencement of operations for drilling for a period of one year. . . .

[9] 

The 1978 Lease also provided for a higher royalty payment to Eunice and her husband at three-sixteenths (
[3]/16).[10]
¶5 Prior to the expiration date in the 1973 Lease and the effective date in the 1978 Lease, a producing well was drilled. Petro-Lewis Corporation, a Colorado corporation, was the operator for the N/2 NE/4 of Section 8-15N-9W from at least June 1978 to May 1985.[11] Petro-Lewis Corporation filed a pooling application with the Oklahoma Corporation Commission on June 12, 1978--wherein it proposed drilling a well on Eunice's land into the Mississippian-Chester Lime common source and pooling the drilling rights to that formation for all of the operators with leaseholds in Section 8-15N-9W--which the Corporation Commission approved on July 21, 1978.[12] The Lena Shawver #1 well (hereinafter "the Shawver Well") was spud on Eunice's land on August 21, 1978, and drilling was completed into the Chester zone of the Mississippian formation on September 24th.[13] Production was first achieved on November 24, 1978.[14]
¶6 After production on the Shawver Well was achieved, all parties acted as if the terms of the 1973 Lease controlled, as demonstrated below.
¶7 On the lessor's side, Eunice acknowledged her right to a [1]/8 royalty on production from the Shawver Well at least three times. First, on July 6, 1979, Eunice signed a Gas Division Order filed with the Corporation Commission, wherein she certified and guaranteed that she was entitled to a [1]/8 royalty payment of half (N/2) of one-quarter (NE/4) of Section 8-15N-9W--i.e., a fractional interest of "[1]/8 of [1]/2 of [1]/4" or a decimal interest of 0.01562500:
TO: PETRO-LEWIS CORPORATION PROPERTY
BOX 2250 PAYMENT NO. OK-EC-77-800-01 

DENVER, COLORADIO 80201 July 6 19 79 

Each of the undersigned certifies and guarantees that he is the legal owner of, and hereby warrants title to, his respective interest as set out below in the natural gas, including gas condensate, produced and saved from the Petro-Lewis Corp.-Lena Shawver #1 lease, located in Kingfisher County, State of Oklahoma , described as 
All of Section 8, Township 15 North, Range 9 West, In Kingfisher County, Oklahoma, limited to the production of gas and condensate from the Mississippi -- Chester Lime Formation
Effective 7:00 A.M. first production 

and until further written notice, you are authorized and directed, subject to all of the subsequent provisions hereof, to give credit as follows for such interest, and in compliance herewith shall relieve you of any further liability to the undersigned with respect to such production:

OWNER NO.

NAME, ADDRESS, AND SOCIAL SECURITY NO.

FRACTIONAL INTEREST

DECIMAL

. . . .

. . . .
Eunice S. Justice
P.O. Box 95
Watonga, Oklahoma 73772
S.S. No. ____________
. . . .

. . . .
1/8 of 1/2 of 1/4
. . . .

. . . .
.01562500 RI
. . . .

. . . .
SOCIAL SECURITY NUMBER:
Attest if owner is corporation, otherwise two witnesses:
__________________________ E.S.J. : /s/ Eunice S. Justice 

__________________________ Eunice S. Justice 

__________________________ 
__________________________ 
__________________________ 
__________________________ [15]
Then on November 6, 1980, Eunice signed another Gas Division Order filed with the Corporation Commission certifying the same decimal interest of 0.01562500.[16] Lastly, in August of 1985, Eunice signed a third Division Order wherein she "verif[ied] and guarantee[d]" that she was entitled to the same decimal interest of 0.0156250.[17] On all three Division Orders, only Eunice is listed as the owner, again demonstrating that the parties were operating under the 1973 Lease to which her husband was not a party.[18]
¶8 On the flip side, the lessees and operators did at least two things that seemingly demonstrate their belief that the 1973 Lease controlled. First, it is undisputed that Eunice always received a [1]/8 royalty on production from the Shawver Well.[19] The record on appeal contains only limited evidence regarding what royalty payments Eunice and/or the Trust received on production from the Shawver Well, but what little evidence does exist would suggest that the Shawver Well maintained continual production and that since 2004 the lessor received [1]/8 royalty payments from all but one gas purchaser (who paid a slightly higher [1]/6 royalty).[20] Second, after a series of assignments made Partnership Properties Co. the owner of both the 1973 Lease and the 1978 Lease effective March 22, 1979,[21] Partnership Properties Co. and its successors-in-interest only made assignments of the 1973 Lease; it is undisputed that the 1973 Lease was assigned at least fifty-six times since 1979.[22] Neither side has presented any evidence of an assignment mentioning the 1978 Lease, thereby further illustrating the parties' understanding that the 1973 Lease controlled.
¶9 Nevertheless, in 2008 Chesapeake Operating Inc. (hereinafter "Chesapeake") drilled a second well and began paying a [3]/16 royalty on its production, as if the 1978 Lease had superseded or amended the terms of the 1973 Lease. Chesapeake became the operator of the Shawver Well in June of 2004.[23] Related Chesapeake entities also began acquiring leasehold interests under the 1973 Lease in 2004 through a series of mergers and assignments involving predecessor-in-interest and former operator of the Shawver Well, Ricks Exploration, Inc. (hereinafter "Ricks Exploration").[24] Then in August of 2007, Chesapeake began pursuing the possibility of drilling a second well into a deeper formation on the Trust's land.[25] The Justice #1-8 well (hereinafter "the Justice Well") was spud on the Trust's land on October 13, 2007, and drilling was completed into the Simpson formation on January 2, 2008.[26] Production was first achieved on January 2, 2008.[27] Shortly thereafter, Eunice, in her capacity as trustee, signed a Gas Division Order effective January 2, 2008, wherein she "warrant[ed] the title to the interest set out below," which included a "Net Ac[reage]" of 80.000000 acres out of 640.000000 unit acres, a "L[ea]se N[et ]R[evenue ]I[nterest]/ R[oyalty ]I[nterest]" of 0.18750000 (equivalent to [3]/16) on production from the Justice Well, and a "Unit Int[erest]" of 0.02343750 (equivalent to a [3]/16 royalty payment of half (N/2) of one-quarter (NE/4) of Section 8-15N-9W--i.e., [3]/16 × [1]/2 × [1]/4).[28] Ever since first production, Chesapeake and its successors have paid the Trust a [3]/16 royalty payment on production from the Justice Well.[29]
¶10 Nearly a decade later, Defendant/Respondent Devon Energy Production Company, L.P. drilled eight multi-unit horizontal wells and began paying a [1]/8 royalty on their production, as if the 1973 Lease controlled over the 1978 Lease. Devon acquired leasehold interests under the 1973 Lease through a merger in January of 2016 with Felix Energy, LLC and Felix Energy Holdings, LLC, and those entities had obtained leasehold interests through a series of assignments tracing back to Ricks Exploration.[30] Starting in 2015, Felix Energy and Devon developed a plan for several new multi-unit horizontal wells that would be spud in, or cross through, the spacing and drilling unit established in Section 8-15N-9W, which includes the Trust's land.[31] Between 2016 and 2018, Devon drilled eight producing horizontal wells collectively referred to as the Bernhardt Wells into the Mississippian (less Chester) formation--i.e., the Bernhardt 8_5-15N-9W 1HX well, the Bernhardt 8_5-15N-9W 2HX well, the Bernhardt 8_5-15N-9W 3HX well, the Bernhardt 8_5-15N-9W 4HX well, the Bernhardt 8_5-15N-9W 5HX well, the Bernhardt 8_5-15N-9W 6HX well, the Bernhardt 8_5-15N-9W 7HX-R well, and the Bernhardt 8_5-15N-9W 8HX well--thereby entitling the Trust to royalty payments on production from these Bernhardt Wells.[32] The Bernhardt 8_5-15N-9W 1HX well began producing in July of 2017, and Devon issued its first royalty payment check to the Trust on November 15, 2017, for production from the months of July, August, and September.[33] From the record on appeal, it appears Devon paid the Trust a [1]/8 royalty on production from Bernhardt 8_5-15N-9W 1HX well,[34] but it remains unclear what, if anything, has been paid on the other Bernhardt Wells.[35] Thus, for the sake of this recitation of facts concerning the merits dispute between Trustees and Devon, it can only be assumed that Devon has been paying the Trust a [1]/8 royalty on production from all the Bernhardt Wells.
¶11 During late 2017 and early 2018, the parties engaged in unproductive prelitigation discussions. At some point in late 2017, the Trustees received from Devon a proposed Division Order for the Bernhardt 8_5-15N-9W 1HX well that caused them some concern, because they believed the Division Order assigned the Trust an incorrect decimal interest.
[36] In response, the Trustees hired counsel, who asked Devon for a copy of the title opinion it had used as a basis for calculating the Trust's decimal interest.[37] The attorney also reached out to the lessees holding interests in the Shawver Well and the Justice Well--i.e., Chesapeake and Gastar Exploration, Inc. (hereinafter "Gastar"), respectively--and requested copies of any title opinions they possessed concerning the Trust's [3]/16 royalty interest on the Justice Well or the Trust's [1]/8 royalty interest on the Shawver Well.[38] Devon promptly produced a few pages from a September 2017 title opinion, but the Trustees' attorney subsequently advised Devon that he "would like to review complete copies of all available title opinions for Section 8" before "taking any legal action."[39] The Trustees' attorney also began taking certain legal positions that would bolster the Trustees' claim to a [3]/16 royalty interest on the Bernhardt Wells. For instance, in a letter from November 22, 2017, he argued "the terms of the Second Lease [i.e., the 1978 Lease] either (1) superseded or voided the terms of the First Lease [i.e., 1973 Lease] or (2) modified and extended the First Lease to the extent of any changes in the lease terms such as the primary term and royalty provisions."[40] He also posited that he and his clients "[we]re not certain but believe[d] that Petro-Lewis Funds, Inc."--who was the lessee under the 1978 Lease--was either "a partner of . . . or the alter ego of " Partnership Properties Co.--who was the lessee under the 1973 Lease when the 1978 Lease was executed.[41] If that were true, then the 1978 Lease might more plausibly be characterized as a novation of the 1973 Lease. Ultimately, on April 5, 2018, Devon refused to produce a full copy of its September 2017 title opinion or any portion of title opinions from October 2006, June 2015, or November 2017 in its possession, asserting that such documents were protected under the attorney-client privilege and as attorney work product.[42] It is unclear from the record on appeal whether Chesapeake or Gastar ever produced any title opinions in their possession. Thereafter the record on appeal falls silent until Trustees commenced litigation.
¶12 On May 7, 2019, the Trustees filed this lawsuit against Devon only.
[43] The Trust brought three claims against Devon: (1) a "QUIET TITLE" claim based on the fact that "[t]here can be only one oil and gas lease on a particular tract of land and for the same interests at the same time" and request for "DECLARATORY JUDGMENT" asking the trial court to find "that the terms of the Shawver/Rodman OGL [i.e., the 1973 Lease] has been supplanted or amended by the terms of the Justice/P-LF OGL [i.e., the 1978 Lease], and, in particular, that the proper royalty rate is 3/16ths on all Bernhardt Wells on the Subject Interests as of the date of first production";[44] (2) an "ACCOUNTING" claim brought pursuant to the Production Revenue Standards Act (PRSA), 52 O.S.2011, §§ 570.1 et seq., asking the trial court to require Devon to make an accounting for all royalty payments made on production from the Bernhardt Wells;[45] and (3) a "PAYMENT" claim brought pursuant to the PRSA asking the trial court to "make [the Trust] whole by making payment to the [Trust] for the shortage" caused by allegedly underpaying royalties, "with interest thereon."[46] Repeating arguments made in the prelitigation letters, the petition alleged the 1973 Lease "ha[d] been amended by" the 1978 Lease "or, in the alternative," the 1978 Lease "[wa]s a novation of" the 1973 Lease.[47] Devon put the case at issue, filing an answer on June 19, 2019, and an amended answer on July 5, 2019.[48] Therein, Devon asserted several affirmative defenses, including that the Trustees' claims were barred by the statute of limitation and by laches and that Trustees "are not entitled to any remedy they seek because they failed to promptly act to enforce any of their alleged rights under the Lease."[49]
¶13 After engaging in limited written discovery,[50] Devon filed a motion for summary judgment on May 18, 2020.[51] Therein, Devon argued that the Trust's quiet title claim is barred by the catchall 15-year statute of limitation for real property actions found in 12 O.S.2011, § 93(4).[52] In particular, Devon argued the undisputed facts demonstrate that the Trust's settlor and predecessor-in-interest, Eunice (née Shawver) Justice, had notice of the lessee's intent to pay a [1]/8 royalty pursuant to the 1973 Lease as far back as 1979, when she signed a Gas Division Order certifying and guaranteeing entitlement to that royalty amount.[53] Thus, Devon argued the Trust's quiet-title claim accrued by 1979 at least and became barred after 1994.[54] Moreover, Devon argued that "[t]here are now at least eight different working interest owners credited with interest associated with the 1973 Lease . . . . [and] at least 16 overriding royalty interest owners whose interest is dependent on the 1/8 royalty provision of the 1973 Lease," whose interests would be disrupted if the 15-year statute of limitation is not applied to provide some certainty of title.[55] Finally, Devon argued that the remaining claims for declaratory relief, an accounting, and payment brought pursuant to 12 O.S.2011, § 1651 and the PRSA, 52 O.S.2011, § 570.14, are precluded insofar as they are all "derivative" claims "contingent on a threshold ruling in [the Trust']s favor on quiet title."[56]
¶14 Trustees filed their response to Devon's motion for summary judgment on June 4, 2020.[57] Their attack of Devon's motion was threefold.
¶15 First, Trustees argued that the material facts Devon proffered in its motion are not undisputed.
[58] Trustees disputed Devon's contentions that the Shawver Well was drilled under the 1973 Lease, that the terms of the 1973 Lease are what they say they are, that Devon's leasehold interests derive solely from the 1973 Lease, and that Eunice's acceptance of [1]/8 royalty payments somehow validated the royalty term in the 1973 Lease--all based on their already familiar argument that the 1978 Lease "either modified the 1973 Lease or acted as a novation thereof."[59] Trustees also disputed Devon's contention that the 1978 Lease named Petro-Lewis Funds, Inc. as the lessee, based on the other familiar argument that "Petro-Lewis Funds, Partnership Properties Co., or Petro-Lewis Corporation are one and the same via an alter ego theory."[60] Trustees disputed Devon's contention that the 1973 Lease had been held by continuous production all these years, arguing that Devon had presented "no evidence of well costs and expenses and revenue provided."[61] Moreover, Trustees disputed Devon's contention that Eunice guaranteed and certified a 1/8 royalty interest in the 1979 Gas Division Order she signed, arguing that such Gas Division Order was not filed of record and therefore did not define ownership interests and that, by its own terms, it was only effective "until further written notice" and therefore became ineffective when Trustees' attorney sent correspondence in November 2017 disputing the royalty interest amount.[62]
¶16 Second, Trustees argued that they "ha[d] identified a number of additional material facts . . . omitted from Devon's Motion for Summary Judgment" that would render summary judgment improper.[63] Most of their additional facts concerned their argument that Partnership Properties Co. and the various Petro-Lewis entities were "one and the same via an alter ego theory," including the presentation of nearly 200 pages of documentation from county land records, the U.S. Securities Exchange Commission (SEC), and the U.S. Department of Interior's Bureau of Land Management.[64] But Trustees also presented evidence that Chesapeake and Gastar had paid them a [3]/16 royalty on production from the Justice Well and that Mustang Gas Products, LLC had even paid them a [1]/6 royalty on production from the Shawver Well since 2005.[65] The Trustees pointed out one check from May 2016 in particular where Chesapeake paid the Trust a [1]/8 royalty on production from the Shawver Well and a [3]/16 royalty on production from the Justice Well--even though, "[s]upposedly, distribution is based on the same leasehold interest"--thereby demonstrating the need for additional fact-finding.[66]
¶17 Lastly, Trustees asserted that the law does not favor Devon. Along these lines, Trustees argued first that it is "nonsensical," "illogical and, therefore, absurd" to suggest "that they should have [to] file[] a quiet title action" in order to obtain royalty payments pursuant to the terms of the 1978 Lease because, as a novation of the 1973 Lease, the terms of the 1978 Lease are enforceable "without any need for court intervention."[67] Trustees argued by extension that Devon is the one who must "challenge the terms of the 1978 Lease at this time" with an action to reform the 1978 Lease or to quiet title in the 1973 Lease, but that any such challenges are "too late" under either the 5-year statute of limitation in 12 O.S.Supp.2017, § 95(A)(2) or the 15-year statute of limitation in 12 O.S.2011, § 93(4).[68] Second, Trustees contended that the law would not require them to file suit years before their appointment as trustees or years before their discovery that Devon was paying the wrong royalty[69]--arguments that again ignore material facts concerning other operators' payments of the "wrong" royalty despite the same predicament of two competing leases and concerning the previous trustee's acceptance of those payments for years without challenge. In a similar vein, Trustees' third legal argument was that "[a]ny Statute of Limitations involving Devon and the Bernhardt wells could only commence with the date of first production from those wells,"[70] which gets to the issue of when the Trustees' quiet title claim accrued. Fourth, Trustees argued that Devon should not be able to rely upon Eunice's certification of a [1]/8 royalty interest in the 1979 Gas Division Order because, according to Kuntz's treatise, division orders generally "do[] not operate as conveyances" and "are not binding to the extent that the operator has been unjustly enriched by retaining benefits under a division order that provides for a different method of royalty calculation than that specified in the lease."[71] This argument seemingly presupposes both that the 1979 Gas Division Order was at odds with an indisputably enforceable lease (rather than one of two possible leases) and that Devon was trying to use the terms of the 1979 Gas Division Order to trump the terms of that indisputably enforceable lease. Fifth, in what appears to be an alternative to their arguments of novation, Trustees argued that the merger-of-title doctrine discussed in Concorde Resource Corp. v. Williams Production Mid-Continent Co., 2019 OK CIV APP 37, 379 P.3d 1157, should apply to make the terms of the 1978 Lease operative because the parties agree that ownership of the 1973 Lease and the 1978 Lease coalesced into Partnership Properties Co. on March 22, 1979.[72]
¶18 Trustees did make two important concessions in their summary judgment response. First, they acknowledged that they were not seeking recoupment of any underpaid royalties on the Shawver Well because "acceptance of the 1/8 royalty based on the division order may well establish estoppel to recovery."[73] Second, Trustees admitted that their remaining claims for declaratory relief, for an accounting, and for back-payments on underpaid royalties are derivative and therefore "are dependent on the survival of their action to enforce their rights as mineral/royalty owners under their 1973 Lease as modified or replaced by their 1978 Lease," which is a euphemism for the quiet title action.[74]
¶19 Then two weeks later, Trustees filed a motion to compel discovery and a motion to supplement their response to Devon's motion for summary judgment. In their motion to compel, Trustees sought production of various title opinions in Devon's possession or control or, at the very least, a privilege log listing all title opinions being withheld.[75] In their motion to supplement, Trustees asked the trial court for leave to supplement their response to Devon's motion for summary judgment with arguments and analysis of any title opinions obtained through their pending motion to compel.[76]
¶20 Devon filed its reply in support of summary judgment on July 6, 2020. Therein, Devon argued that any dispute over the status of the 1978 Lease as a novation or amendment of the earlier 1973 Lease accrued by 1979, such that the Trustees' quiet title claim brought more than fifteen years later is barred.[77] Devon further argued that the Trustees' attempt to reframe their claim as one that arose more recently--i.e., after drilling of the Bernhardt Wells--focuses on the damages they seek for underpayment rather than on the viability of the underlying claim and fails to recognize that the drilling of the Bernhardt Wells did not create the dispute at the heart of Trustees' quiet title claim.[78] Devon also asserted that neither the appointment of the Trust's new trustees in 2016 nor the generation of new title opinions since 1978 revived the Trustees' time-barred quiet title claim.[79] With respect to the Division Orders, Devon argued that the Division Orders were not being used as the source for the [1]/8 royalty interest (as that royalty was specified in the 1973 Lease) but were only being used to demonstrate that Eunice and the Trust had actual notice their payments were based on a [1]/8 royalty interest.[80] Concerning Trustees' argument about merger of title, Devon asserted that "the issue should have been adjudicated in 1979 or 15 years thereafter" and that the merits of such an argument were contradicted by Eunice's certification of the royalty interest from the 1973 Lease and by her "40-year course of conduct accepting a 1/8 royalty consistent with the 1973 Lease."[81] Finally, in an effort to deflate Trustees' reliance upon Chesapeake's payment of a [3]/16 royalty on production from the Justice Well, Devon produced a letter from Chesapeake's attorney to Trustees' attorney that (1) suggested the [3]/16 royalty was based upon "typographical errors" in the title opinions upon which Chesapeake had relied (which he was contemporaneously producing to the Trustees); (2) characterized the 1978 Lease as "a top lease" that never became effective "as the first lease was perpetuated by the Lena Shawver 1-8 well"; and (3) asserted "Chesapeake would [therefore] have a counterclaim against the trust" for overpayment "of the royalties paid on production from the Justice 1-8 well."[82]
¶21 The same day, Devon filed its responses to Trustees' motion to compel and motion to supplement, arguing that the title opinions being sought were protected by the attorney-client privilege and were irrelevant to the statute-of-limitation issue raised on summary judgment, as nothing contained in the title opinions could revive the Trust's barred quiet title claim.[83]
¶22 On July 21, 2020, the trial court held a hearing on Trustees' motion to compel, Trustees' motion to supplement, and Devon's motion for summary judgment. The trial court received brief arguments from each side. Trustees' attorney argued that they were entitled to receive all the title opinions, particularly insofar as privileged communications were protected from disclosure under the parties' agreed protective order.[84] Yet again, he attempted to reframe Trustees' quiet title claim as an action to enforce record title in order to distinguish their claim from the run-of-the-mill quiet title claims (e.g., a quiet title claim requiring reformation of a deed) to which a statute of limitation would apply:
[T]his case is not about trying to reform a deed. This is about simply our quiet title -- excuse me -- our record title, which in essence they need to honor. We're asking the Court simply ask them to honor. It's based on record title, which has two documents in it. It's got a 1973 lease and a 1978 lease modification. That's the end of the story, Your Honor. Everything else they bring up is irrelevant.
. . . .
. . . [T]he record title is obviously in our name. We don't have to reform any deeds. We don't have to do anything. It's there.
[85]
In response, Devon's attorney argued the case was not about who owns the mineral interests and that Devon wasn't presenting the 1979 division order to change title, but instead to demonstrate when a dispute over the applicability of the 1973 Lease accrued:
[T]he only point of the division order is not to change title whether it exists or does not exist. The only point of the division order is to demonstrate that this was a dispute that was out there since 1979. So as of today, we're not addressing any sort of claims or damages or who owns it, who doesn't own it.
As of 1978 or 1979, there was a recognition that the 1973 lease applied. There's no dispute. Since 1979 we have recognized the 1973 lease. So it's that recognition that has lasted for 15 years and now the statute of limitations in order to quiet title, to have a different recognized lease[,] that's expired.
[86] 
Regarding the motion to compel, Devon's attorney argued that the privileged communications in the title opinions would have no relevance to the statute-of-limitation issue raised on summary judgment and that privileged communications don't have to be produced just because there's a protective order in place:
Devon's attorneys' opinions has [sic] no bearing on that [i.e., when a dispute over the leases arose].
Privileged information is not discoverable. Whether [Trustees' attorney] advises his clients, you know, what, I'm not sure that that is going to be a great case, but let's try it anyway. That's privileged. He can tell his clients that anyway, but, boy, I sure would like to know if he told his clients that, right?
Like it doesn't matter what type of information, even if there was a smoking gun, which there's not. If there was a smoking gun, it doesn't matter, it's still privileged. What attorneys tell their clients, that is attorney-client communication. That's privileged.
. . . .
My client does not have to provide privileged information to the other side. His clients do not have to provide privileged information to us. It doesn't matter if the protective order keeps it within the lawsuit, it's still privileged.
[87] 
The trial court then announced it was denying Trustees' motion to compel and motion to supplement and granting Devon's motion for summary judgment:
THE COURT: All right. The plaintiffs' motion to compel and motion for leave to supplement its response, they're both denied.
The defendant's motion for summary judgment, I believe that the '78 lease was a top lease that never took effect because the '73 lease remained in force by production and that the plaintiffs' claims are barred by the statute of limitations, so the motion is granted.
[88]
After the trial court announced its ruling, the Trustees' attorneys gave some push-back. One attorney asked, "For the record, Your Honor, can I ask how you concluded it was a top lease when it had no conditions on it at all?"[89] The trial court simply responded, "That's my ruling."[90] Another attorney told the trial court Trustees had been preparing their own summary judgment motion and "needed the title opinions in order to present [thei]r own motion, which raises other issues that [he] believe[d] would change -- potentially change [the court's] opinion with the facts that come forth."[91] In response, the trial court clarified its ruling on the motion to compel by stating, "[T]he problem is attorney-client privilege and you can't -- I did thousands of title opinions as an attorney and I never expected someone else to be able to get my title opinion to my client, unless my client said you could see it."[92]
¶23 The parties disputed the contents of the various proposed orders and asked the trial court to settle the matter for them.[93] On October 14, 2020, the trial court entered Devon's proposed orders; the language of the orders denied the motion to compel because the "title opinions are protected from disclosure by the attorney-client privilege," generically denied the motion to supplement, and granted the motion for summary judgment because "[t]he applicable statute of limitations for Plaintiff's [sic] claims has expired." [94]
¶24 On October 23, 2020, Trustees filed a motion for new trial pursuant to 12 O.S.2011, § 651(6) on the basis that the trial court's three orders were "contrary to law."[95] The trial court denied Trustees' motion for new trial in January of 2021.[96]
¶25 On February 19, 2021, Plaintiffs filed a timely appeal of trial court's January 25, 2021 order denying Trustees' motion for new trial and of the October 14, 2020 orders denying Trustees' motion to compel, denying Trustees' motion to supplement, and granting Devon's motion for summary judgment.[97] This Court assigned the appeal to the Tulsa Divisions of the Oklahoma Court of Civil Appeals (COCA) on March 17, 2021.[98] As the appeal concerned entry of summary judgment, it proceeded according to Supreme Court Rule 1.36, 12 O.S.Supp.2020, ch. 15, app. 1, without appellate briefing.
¶26 COCA issued its opinion on November 5, 2021, affirming all of the trial court's orders by a 2-to-1 vote.
[99] On de novo review of the summary judgment,[100] Judge Wiseman and Judge Barnes found that the 15-year statute of limitation in 12 O.S.2011, § 93(4) applied to the Trust's quiet title claim and that the limitation period "began to run at the time of filing a document creating a cloud on the title to the minerals."[101] The COCA majority consequently held that "Plaintiffs' quiet title claim accrued in 1978, when according to Plaintiffs, the 1978 lease either modified the 1973 lease or was a novation superseding the first lease resulting in a cloud on the title" and that "the trial court correctly held[] Plaintiffs' quiet title claim is time-barred by operation of the 15-year applicable statute of limitations." [102] The COCA majority also addressed whether this Court's recently issued opinion in Claude C. Arnold Non-Operated Royalty Interest Properties, L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817, had any impact on the outcome of this case, ultimately determining "[t]he facts in this case are readily distinguishable from Arnold."[103] More specifically, the COCA majority found that the plaintiffs in the Arnold case "played no role in drafting or recording" the subsequent leases that supposedly put a cloud on their overriding royalty interest and therefore had no notice of any interest adverse to their own, whereas in this case "Plaintiffs or their predecessors had actual knowledge of the 1978 lease and had the opportunity to challenge Defendant's claim or maintain their quiet title action when the conflict first arose in 1978 and for 15 years thereafter."[104] The COCA majority further found that, "[b]ecause the trial court correctly granted summary judgment, the trial court did not abuse its discretion in denying Plaintiff's motion for new trial."[105] Finally, based upon their belief that the summary judgment issues were dispositive of the appeal, the COCA majority affirmed the trial court's orders denying Plaintiffs' motion to compel and motion to supplement.[106]
¶27 Judge Blackwell dissented because he "d[id] not agree that the plaintiffs' claims accrued as of the effective date of the 1978 lease."[107] He believed that, despite factual differences, application of the rule announced in the Arnold case should control and that Trustees' claim for royalties on new production from those wells did not accrue until Trustees demanded payment in 2017.[108] Thus, he believed the trial court erred in finding that all of Trustees claims--in particular the PRSA claims for accounting and royalty payments--were barred.[109] Judge Blackwell further noted that he "do[es] not believe there is any statute of limitations governing a simple action to quiet title" and that the 15-year statute of limitation in 12 O.S.2011, § 93(4) only applies to "an action to recover real property," which "is distinct from" an action to quiet title.[110] Thus, he would not rely on Pangaea Exploration Corp. v. Ryland, 2007 OK CIV APP 106, ¶ 11, 173 P.3d 108, 112, as authority for application of § 93(4)'s statute of limitation to a quiet title action, but would instead rely upon Oklahoma Supreme Court cases like Hester v. Watt, 1950 OK 131, 218 P.2d 641, and Alfrey v. Richardson, 1951 OK 133, 231 P.2d 363, saying that quiet title actions are equitable in nature and are therefore not susceptible to any statute of limitation.[111] Finally, the dissent suggested in a footnote that the only applicable statute of limitation in this case would be the 5-year statute of limitation in 52 O.S.2011, § 570.14(D), which would apply to Trustees claims for an accounting and payment of royalty shortages.[112]
¶28 The COCA majority did address one of the dissent's arguments in a footnote. In response to the Judge Blackwell's assertion that no statute of limitations applies to a quiet title action, the majority opinion countered that "equity in these circumstances would dictate the application of the doctrine of laches over this 40-year period to reach the same result."[113] In support of this conclusion, the COCA majority quoted this Court's opinion from Wilson v. Bombeck, 1913 OK 486, 134 P. 382, for the proposition that equity can and often does "adopt[] the period of the statute of limitations."[114]
¶29 Latching onto portions of Judge Blackwell's dissent, Trustees filed a petition for writ of certiorari on January 28, 2022, seeking this Court's review on the following issues:
(1) Whether COCA wrongly determined that Trust's quiet title claim was subject 

(a) to a statute of limitations, in general, in view of this Court's precedents in Hester v. Watts, 
1950 OK 131, 218 P.2d 641, and Board of County Commissioners of Choctaw County v. Schuessler, 1960 OK 252, 358 P.2d 830,[115] and 
(b) to the 15-year statute of limitation in 12 O.S.2011, § 93(4), in particular, in view of the 5-year statute of limitations in § 570.14(D) of the PRSA that governs disputes over "marketable title" and this Court's precedent in Hall v. Globe Life & Accident Insurance Co., 1999 OK 89, 998 P.2d 603, concerning the application of specific provisions over general provisions;[116] 
(2) Whether COCA wrongly distinguished this Court's precedent in Claude C. Arnold Non-Operated Royalty Interest Properties, L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817, concerning when the Trust's quiet title claim accrued;[117] and 

(3) As a matter of first impression, "where 'marketable title' is required to be determined under the PRSA, [see 52 O.S.2011, § 570.10(D)(2)(a),] whether the trial court can decide that question without reviewing the applicable title opinion."[118]
This Court granted certiorari on September 26, 2022. We now vacate the Court of Civil Appeals opinion and review each of the issues raised on certiorari to ascertain whether the trial court committed reversible error.
II. STANDARD OF REVIEW
¶30 The propriety of the trial court's summary judgment is a question of law that this Court reviews de novo. Payne v. Kerns, 2020 P.3d 659, ¶ 10, 467 P.3d 659, 663 (citing Manley v. Brown, 1999 OK 79, ¶ 22, 989 P.2d 448, 455). Thus, we have plenary, independent, and non-deferential authority to determine whether the trial court erred in its conclusion that there was no genuine dispute of a material fact or in its application of the law. Id. (citing Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081, 1084). The statute of limitation is an affirmative defense. 12 O.S.Supp.2018, § 2008(C)(18); cf. supra notes 48--49 and accompanying text (stating that Devon listed the statute of limitation among its affirmative defenses). "Where, as here, the defendant moves for summary judgment on the basis of an affirmative defense, [it] must show that there is no substantial controversy as to facts that are material to the affirmative defense, and that the facts and inferences that may be reasonably drawn from them are in his favor." Daugherty v. Farmers Coop. Ass'n, 1984 OK 72, ¶ 5, 689 P.2d 947, 949 (citing Martin v. Chapel, Wilkinson, Riggs & Abney, 1981 OK 134, 637 P.2d 81).
¶31 We review the trial court's denial of a motion for new trial for abuse of discretion. Ullman v. Okla. Highway Patrol, 2023 OK 100, ¶ 15, --- P.3d ---. "Where, as here, our assessment of the trial court's exercise of discretion in denying [Trustees] a new trial rests on the propriety of the underlying grant of summary judgment, the abuse-of-discretion question is settled by our de novo review of the summary adjudication's correctness." Reeds v. Walker, 2006 OK 43, ¶ 9, 157 P.3d 100, 107.
III. ANALYSIS AND REVIEW
A. The Nature of the Trust's Claim
¶32 The most critical issue in this dispute--i.e., the crux of the appeal--is how to classify the claim that the trial court has deemed barred under the 15-year statute of limitation in 12 O.S.2011, § 93(4). Once this question is answered, we can streamline all the issues raised in the Trust's petition for writ of certiorari.
¶33 We face this question because Trustees have been characterizing the claim differently at various junctures throughout this litigation. In their petition initiating this lawsuit, Trustees captioned their first cause of action as seeking to "QUIET TITLE" and to obtain "DECLARATORY JUDGMENT"--a claim that was separate from the second and third causes of action for "ACCOUNTING" and "PAYMENT," respectively, under the PRSA. See supra notes 44--46 and accompanying text. In their response to Devon's motion for summary judgment, Trustees minimized the quiet-title nature of the claim by asserting that their theory of novation made the 1978 Lease enforceable "without any need for court intervention," by contending that Devon was the party who must file a quiet title action to make the 1973 Lease enforceable, and by conceding that the PRSA claims "are dependent upon survival of their action to enforce their rights" under the novated lease. See supra notes 67--68, 74 and accompanying text (emphasis added). Now, at the certiorari stage Trustees are speaking out of both sides of their mouth. On one hand, Trustees fault COCA for applying any statute of limitation to a quiet title action, see Appellants' Pet. for Writ of Cert. 2, 6, 10; yet Trustees are again attempting to recharacterize the claim, this time as a PRSA claim that necessarily requires the courts to review "marketable title":
By applying the 15-year SOL, the [COCA] majority Opinion ignores the basis of the claim being made by Appellants and the history of the production from all of Section 8, and ignores the specific five-year S[tatute ]O[f ]L[imitation] provided by the PRSA. . . . The 15-year SOL is not the applicable SOL on this PRSA production payment dispute.
See id. at 7, 9 (emphasis added). Thus, Trustees have provided us with a smorgasbord of characterizations for their claim. We cannot address the issues raised on certiorari until we determine what the Trust's claim truly is.
¶34 Trustees' attempt during summary judgment to recast the claim solely as an action seeking a declaratory judgment that Devon must honor record title is clever, yet problematic. First of all, Trustees cite no authority supporting their argument that the 1978 Lease would be enforceable without court intervention. "A proposition which is unsupported by citation to authority will not be considered on appeal." Hough v. Hough, 2004 OK 45, ¶ 16, 92 P.3d 695, 703; cf. Vernor v. Poorman, 1916 OK 608, ¶ 23, 158 P. 615, 619 ("[A]ttorneys who present cases here have no right to place the burden upon this court and consume their time in a laborious research for authorities to support their argument. Sound argument has weight, but in a well-considered case we find both approved argument and established precedent, and the best way to win your case is to back it up with a citation of authorities in point. No other kind of brief is worth while."). Second, in arguing that the 1978 Lease is enforceable without court intervention, Trustees seem to forget that they filed a petition seeking court intervention. Third, in arguing that any action to quiet title in the 1973 Lease or to reform the 1978 Lease should be filed by Devon, Trustees seemingly go too far when they suggest that Devon's ability to file such actions would be barred by the applicable statutes of limitation found in 12 O.S.2011, § 93(4) and 12 O.S.Supp.2017, § 95(A)(1), respectively. See supra note 68 and accompanying text. Such a suggestion seems to belie Trustees' other arguments about the application of any statute of limitation against the quiet title claim found in their petition. Perhaps most damning to Trustees' attempted rebrand, however, is their attorney's statement at the summary judgment hearing: "[T]his case is not about trying to reform a deed. This is about simply our quiet title -- excuse me -- our record title, which in essence they need to honor." See supra note 85 and accompanying text (emphasis added). This Court need not concern itself with a sleight-of-hand argument that is not even taken seriously by its proponent.
¶35 Similarly, Trustees' attempt to recharacterize their claim as a "PRSA production payment dispute" at the certiorari stage is both disingenuous and incorrect for the reasons outlined below.
¶36 First of all, Trustees have previously distinguished the claim at issue from their separate PRSA claims for accounting and payment. Thus, Trustees should be estopped now from assuming an inconsistent position to the prejudice of Devon.
¶37 Second, as our precedent in Purcell v. Santa Fe Minerals, Inc., 1998 OK 45, 961 P.2d 188, demonstrates, the Trust's claims under the PRSA are really an action ex contractu--i.e., they arise out of a contract--which makes the PRSA ill-suited for situations where the parties cannot agree on a governing contract. In Purcell, the lower courts had determined that the lessor's claim for underpaid royalties was limited by the 5-year statute of limitation in 12 O.S.1991, § 95(First) applicable to "[a]n action upon any contract . . . in writing" and that she was entitled to prejudgment interest at 12% pursuant to 52 O.S.1991, § 540 (which was renumbered as § 570.10 of the PRSA when that act was passed in 1992). Purcell, 1998 OK 45, ¶ 7, 11, 961 P.2d at 190--91. On certiorari, "[t]he only question remaining [wa]s whether she [wa]s entitled to the 12% interest on her entire viable claim (back five years), or for some lesser period of time." Id. ¶ 7, 961 P.2d at 190. The lessor "argued that the 12% interest was a contractual claim, and that the five-year limitations period applicable to unpaid royalties also applied to the interest." Id. ¶ 8, 961 P.2d at 190. The lessee argued for a shorter statute of limitation, claiming the 12% interest rate was subject either to the 3-year statute of limitation in section 95(Second) that applied to "an action upon a liability created by a statute other than a forfeiture or penalty" or to the 1-year statute of limitation in section 95(Fourth) that applied to "an action upon a statute for penalty or forfeiture." Id. ¶¶ 8, 11, 961 P.2d at 190--91. Thus, "[t]he issue [wa]s how to characterize, for the purpose of limitations, a claim for the 12% interest authorized by § 540 (now § 570.10). Is it part of a contractual cause action [sic] based upon a breached lease, or is the claim one for interest based upon a liability created by statute, or is it an action based on a statute for a penalty?" Id. ¶ 10, 961 P.2d at 191. We determined that the PRSA's precursor statute did not create the duty to pay royalties to the lessor; the lease (i.e., the contract) did that. Id. ¶ 22, 961 P.2d at 194. Consequently, "for the purpose of applying a statute of limitations[,] § 540 [wa]s not a statutory liability independent of a contract or agreement between the parties"; and "[w]e affirm[ed] the District Court's use of a five-year statute of limitations for Purcell's claim as to interest as well as royalty payments." Id. Our holding confirmed that a PRSA claim is a contractual claim. Thus, the PRSA can only be utilized after the parties have settled which of two contracts controls.
¶38 Third, the issue of whether Trustees hold marketable title is distinct from the issue of which lease controls between the 1973 Lease and the 1978 Lease. Although one's "right to payment" under the PRSA "rests upon a showing of marketable title," Hull, 1989 OK 168, ¶ 14, 789 P.2d at 1279; see also 52 O.S.2011, § 570.10(D)(2)(a) (allowing the withholding of royalty proceeds where "title thereto is not marketable" with interest charged at a lower rate of "six percent (6%) per annum to be compounded annually"), Trustees' establishment of "marketable title" to the N/2 NE/4 of Section 8-15N-9W would not help in narrowing down which lease controls. Marketability of Trustees' title would be determined by looking at title abstracts, deeds, trust agreements, and death certificates, whereas the dispute over which lease controls would require a review of other documents like the two leases and subsequent lease assignments--all of which would be irrelevant to the marketable title analysis. Moreover, it does not appear that the parties even dispute whether Trustees have marketable title, as Devon has been making royalty payments to Trustees since four months after initial production from the Bernhardt 8_5-15N-9W 1HX well. See supra note 33 and accompanying text.
¶39 Rather, the dispute at the heart of the Trust's claim is over which of two leases governs the relationship between the Trust and Devon. That dispute is better resolved through an equitable action to quiet title. Since at least 1926, this Court has recognized the "well settled" principle that "a court of equity has jurisdiction to settle the validity and priority of oil and gas leases between contesting lessees, where such leases have been executed by a common landowner." Gypsy Oil Co. v. Marsh, 1926 OK 246, ¶ 4, 248 P. 329, 331 (citing other jurisdictions and treatises); see also Franklin v. Margay Oil Corp., 1944 OK 316, ¶ 0 (Syllabus #1), 153 P.2d 486, 489. Similarly, in the case of Voiles v. Santa Fe Minerals, Inc., 1996 OK 13, 911 P.2d 1205, we observed that a quiet title action could be used to settle the validity and priority of oil and gas leases in a contest between the lessor and the lessee on one of the leases: "A quiet title action may be used as an equitable proceeding to determine ownership of oil and gas lease or mineral rights." Id. ¶ 35, 911 P.2d at 1213 (citing Crockett v. McKenzie, 1994 OK 3, 867 P.2d 463; Atl. Richfield Co. v. Tomlinson, 1993 OK 106, 859 P.2d 1088; I.C. Gas Amcana, Inc. v. J.R. Hood, 1992 OK 119, 855 P.2d 597). Finally, in our 2021 opinion in the Arnold case, we referred to a claim that very closely resembled the Trustees' claim in this case--i.e., a dispute over whether a 1973 Lease or a 1984 Lease controlled--as "a quiet-title action, which may be used as an equitable proceeding to determine ownership of oil and gas lease or mineral rights." See Arnold, 2021 OK 4, ¶ 10, 485 P.3d at 820 (quoting Voiles, 1996 OK 13, ¶ 35, 911 P.2d at 1213). Thus, our precedents demonstrate a long history of using quiet title actions to settle which of two leases has priority.
B. The Trial Court Properly Applied a Statute of Limitation to Trust's Claim.
¶40 At this juncture, we can now resolve the first question Trustees raise on certiorari, i.e., "whether any S[tatute ]O[f ]L[imitations] is applicable to a quiet title suit." Appellants' Pet. for Writ of Cert. 10. We must decide whether the trial court committed legal error in applying any statute of limitation to Trust's quiet title claim.
¶41 The parties hardly present any argument on this issue. Trustees merely assert in their certiorari petition that the "the Court of Civil Appeals has decided a question of substance in a way probably not in accordance with applicable decisions of this Court" in "failing (a) to recognize that case law holds there is not a statute of limitations on a quiet title suit," and then argue that "[t]he dissenting opinion in the current Court of Civil Appeals decision (Blackwell, J.) was correct when it states 'I do not believe there is any statute of limitation governing a simple action to quiet title'" and point us to two of the four cases cited in the dissent. Id. at 2, 6 (citing COCA's Op. ¶ 2, at 20--21 (Blackwell, J., dissenting); Hester v. Watts, 1950 OK 131, 218 P.2d 641; Bd. of Cty. Comm'rs of Choctaw Cty. v. Schuessler, 1960 OK 252, 358 P.2d 830). Devon devotes none of its certiorari answer to this issue.
¶42 The two cases cited by Trustees state only the general rule that governs the use of statutes of limitation as a defense to equitable quiet title actions, without any nuance. The relevant language from the Hester case states: "That by reason of the equitable character of the [quiet title] action the statutes of limitation relied on have no application is clear on authority of the [State ex rel. Commissioners of Land Office v.] Reynolds[, 1949 OK 65, 206 P.2d 184] case and the cases cited therein." Hester, 1950 OK 131, ¶ 10, 218 P.2d at 643. The Schuessler case, citing the Hester case, held: "In view of the fact that plaintiffs [i.e., Jimmie E. Schuessler and Zoe Schuessler Lee] have been in possession of the land in controversy since shortly after same was sold to [Carl] Schuessler [by defendant County Commissioners], we are of the opinion that plaintiffs' action [to quiet title] is not barred by the statutes of limitation." Schuessler, 1960 OK 252, ¶ 24, 358 P.2d at 835 (citing Hester, 1950 OK 131, 218 P.2d 641). In other words, the general rule "is well established by many decisions that the statute of limitations never runs against the plaintiff in a quiet title action who is in possession" of the property at issue. Phillips v. Thompson, 1964 OK 18, ¶¶ 16--17, 389 P.2d 473, 474--75 (citing Alfrey v. Richardson, 1951 OK 133, ¶ 21, 231 P.2d 363, 368--69; Whitehead v. Bunch, 1928 OK 576, ¶ 8, 272 P. 878, 879; Warner v. Mason, 1925 OK 199, ¶¶ 37--38 , 234 P. 747, 750-51; Self v. Prairie Oil & Gas Co., 19 F.2d 481, 482 (8th Cir. 1927), rev'd on other grounds, 28 F.2d 590 (8th Cir. 1928). "The reason for this rule [is] that while the owner in fee continues liable to an action, proceeding, or suit upon the adverse claim [made by someone not in actual possession (e.g., a lienholder)], he has a continuing right to the aid of a court of equity to ascertain and determine the nature of such claim and its effect on his title, or to assert any superior equity in his favor." Id. ¶ 16, 389 P.2d at 475 (quoting 44 Am. Jur. Quieting Title § 63 (1942)). Said another way, "[t]he rationale of the rule that the statute does not run against one in possession is that if one is asserting peaceable dominion over and obtaining the benefit from that which he claims he acquired by the conveyance in question, he is entitled to assume that the other party to the instrument is acquiescing in his claim." Maloy v. Smith, 1959 OK 69, ¶ 12, 341 P.2d 912, 915.
¶43 Nuances exist, however, as the general rule is subject to certain exceptions. For instance, when the party seeking to quiet title has not been in continuous, uninterrupted possession of the property at issue, his equitable claim to quiet title will be viewed as a legal claim to recover the property, which is subject to a statute of limitation. See 65 Am. Jur. 2d Quieting Title § 46 (2021); accord Jenkins v. Frederick, 1952 OK 456, ¶ 22, 257 P.2d 1058, 1063 ("Having lost her title to her mineral interests under the resale [for purposes of satisfying her tax obligations], when defendant pleads here that she has title and that plaintiff [i.e., buyer] has no title to said minerals and seeks to have her title quieted, she is bringing an action for the recovery of real property from one who was in possession beyond the period limiting the time within which she could bring such action." (emphasis added)); Dillon v. Helm, 1945 OK 303 ¶ 16, 163 P.2d 539, 542 (applying the 15-year statute of limitation in 12 O.S.1951, § 93(4) to a quiet title action where the Court determined "this action is in substance one for recovery of such interest" in the real property). "The complainant cannot, by stating in his complaint that the proceeding is a suit to quiet title, convert a cause which is legal into one which is equitable, so as to control the application of the statute [of limitation]." 44 Am. Jur. Quieting Title § 63 (1942). Thus, the applicability of any statutes of limitation to the Trust's quiet title claim would depend upon whether Eunice Justice (as the Trust's predecessor-in-interest) had maintained continual, peaceable, and uninterrupted possession of the mineral interests underlying the N/2 NE/4 of Section 8-15N-9W.
¶44 But what exactly does it means to be "in possession of" a mineral interest? It is axiomatic that possession of the land on the surface is not necessarily the same thing as possession of the minerals underneath the surface, as those two interests can be severed. See Deruy v. Noah, 1947 OK 269, ¶ 12, 185 P.2d 189, 191 ("The general rule is: 'The decisions are unanimous in holding that where the title to the mineral right has been severed from the title to the surface, possession of the surface by its owner is not adverse to the owner of the mineral below it. The mineral owner does not lose his possession by any length of nonuser, and the surface owner cannot acquire title to the minerals by adverse possession based on his exclusive and continued occupancy of the surface alone." (quoting 1 Am. Jur. Adverse Possession § 119 (1936))); Barker v. Campbell-Ratcliff Land Co., 1917 OK 208, ¶ 5, 167 P. 468, 470 ("In the early days of the common law a man who had possession of the surface held to the center of the earth; but under modern developments of mineral lands, including oil and gas, it often happens that the owner of a farm grants and conveys the right to explore and take from the land the minerals, retaining to himself the possession and right to cultivate the surface. . . . The possession of the surface by plaintiff for the purpose of cultivation gave him no possession of the oil and gas under the surface, and did not exclude the defendants from the right to go upon the land and prospect for the same."). Instead, possession of mineral interests must be demonstrated through other means and methods. One method for demonstrating "possession" of a mineral interest is to hold unencumbered record title. Maloy, 1959 OK 69, ¶ 10, 341 P.2d at 915 (discussing the case of Easley v. Ashton, 1949 OK 214, 219 P.2d 199, and finding that its holding "that the statute of limitations was applicable to an action to quiet title to a mineral interest where it was necessary to cancel a mineral deed, regular on its face, before title could be quieted" was "tantamount to holding that one is not in possession of minerals when the title stands in someone else's name (absent leasing or drilling operations), at least insofar as the effect of possession or the lack thereof bears upon the applicability of the statute of limitations in an action to reform or cancel a deed" (emphasis added)). Another method for demonstrating "possession" of a mineral interest--one that is typically used by parties asserting adverse possession--is to show that they have taken steps toward reducing the minerals to possession through drilling operations. See, e.g., Atl. Richfield Co. v. Tomlinson, 1993 OK 106, ¶ 20, 859 P.2d 1088, 1094 ("In order for a person to adversely possess a severed mineral estate, he must actually open a well on a tract of land and reduce the minerals under that tract to possession for the statutory period." (citing Mohoma Oil Co. v. Ambassador Oil Corp., 1970 OK 161, ¶ 48, 474 P.2d 950, 960)); Douglass v. Mounce, 1956 OK 288, ¶ 8, 303 P.2d 430, 433 (per curiam); Deruy, 1947 OK 269, ¶¶ 14, 17, 185 P.2d at 191 ("'Where ownership of the surface and of the mineral rights has been severed, the only way the Statute of Limitations can be asserted against the owner of the mineral rights or estate is for the owner of the surface estate or some other person to take actual possession of the minerals by opening and operating mines for the statutory period.' . . . In the instant case defendant Deruy made no allegation or claim that he had at any time made any attempt to explore for oil, gas, or other minerals, or that he had done anything whatever toward taking or even authorizing the taking of minerals from the land." (quoting Claybrooke v. Barnes, 22 S.W.2d 390, 392 (Ark. 1929)). Bearing in mind these two methods for possessing mineral interests, we can now reframe the relevant inquiry in terms of whether Eunice maintained unencumbered record title over the mineral interests, or whether anyone else had taken steps adverse to Eunice's ownership through drilling and production operations.
¶45 The facts demonstrate that Eunice did not maintain unencumbered record title over the mineral interests, because the Rodman Corporation and its assignees held a leasehold interest in those minerals under the 1973 Lease. Their lease gave them the right to explore and drill for oil and gas at any depth in the N/2 NW/4 of Section 8-15N-9W and, if a producing well was achieved, to maintain operations for as long as the well produced in paying quantities. Eunice had "lost" continual, peaceable, and uninterrupted possession of a portion of her mineral interests in 1973 when she gave the Rodman Corporation an exclusive right to explore and drill; and in 1978 she still lacked continual, peaceable, and uninterrupted possession of the full mineral interests. The existence of that 1973 Lease encumbered Eunice's right to execute a second, contemporaneous lease governing those same minerals in favor of a different lessee. As long as the 1973 Lease remained in effect, Eunice could not give anyone else the right to explore, drill, or produce oil and gas in the N/2 NW/4 of Section 8-15N-9W. See supra note 44 and accompanying text (wherein Trustees acknowledged in their Petition that "[t]here can be only one oil and gas lease on a particular tract of land and for the same interests at the same time"). This restriction on Eunice's property rights constitutes a cloud that would have been clearly discernible to both Eunice and others after execution and recordation of the 1978 Lease. At that point in time, the two leases created a cloud on the competing leasehold interests and, by extension, on Eunice's mineral interests. Thus, going back to the rationales for when a statute of limitation should come to bear on a quiet title claim and when it should not, Eunice should have seen that her possession of the mineral interests was encumbered by the existence of two leases and should have been on notice that she needed to quiet title in favor of her preferred lease through cancellation of the opposing lease. Her quiet title claim would consequently fall under the exception to the general rule and would be subject to a statute of limitation.
¶46 In conclusion, it was not error for the trial court to subject the Trust's quiet title claim to a statute of limitation.
C. The Trial Court Properly Applied the 15-Year Statute 
of Limitation Found in 12 O.S.2011, § 93(4).
¶
47 Having determined that a "S[tatute ]O[f ]L[imitations] is applicable to [this] quiet title suit," Trustees second question raised on certiorari is, "if so, whether the 15-year or the 5-year S[tatute ]O[f ]L[imitations] applies." Appellants' Pet. for Writ of Cert. 10. In other words, we must decide whether the trial court committed legal error by applying the wrong statute of limitation to the Trust's quiet title claim.
¶48 The parties engage this issue more heartily than the last. Trustees first recharacterize their quiet title claim as a "PRSA production payment dispute" that requires a determination of "marketable title" and then argue that the "majority Opinion [from the Court of Civil Appeals] ignores the basis of the claim being made by Appellants . . . and ignores the specific five-year S[tatute ]O[f ]L[imitations] provided by the PRSA" in 52 O.S.2011, § 570.14(D). Id. at 2--3, 6, 10. Trustees also point back to the COCA dissent in support of their position, arguing that "[t]he dissent correctly based its opinion on Claude C. Arnold Non-Operated Royalty Interest Props., L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817 in finding that the five-year S[tatute ]O[f ]L[imitations] applies in this case (if any is applicable)." Appellants' Pet. for Writ of Cert. 6 (referencing COCA's Op. ¶ 2 n.3, at 21 n.3 (Blackwell, J., dissenting)).[119] Finally, Trustees cite Hall v. Globe Life & Accident Insurance Co. of Oklahoma, 1999 OK 89, 998 P.2d 603, and In re Assessments for Tax Year 2012 of Certain Properties, 2021 OK 7, 481 P.3d 883, and State ex rel. Crawford v. American Standard Life & Accident Insurance Co., 2001 OK CIV APP 152, 37 P.3d 971, in support of their argument that the 5-year statute of limitation for PRSA claims in 52 O.S.2011, § 570.14(D) is more specific to their claim and therefore governs over the 15-year statute of limitation for the recovery of real property in 12 O.S.2011, § 93(4) that is more general.
¶49 In its certiorari answer, Devon points out that Trustees are "tr[ying] to re-frame this lawsuit" that has always been about which of the two leases from the 1970s controls into a lawsuit that is "about production from the Bernhardt wells" drilled in 2015. Resp't's Answer to Pet. for Writ of Cert. 1. Devon also points out that Trustees "have repeatedly admitted [their] PRSA claim relating to the payments for the Bernhardt wells is a damages aspect dependent on an initial determination of the base quiet title dispute," citing Trustees' initiating petition and summary judgment response. Id. at 3 (quoting Pls.' Resp., supra note 3, at 20; Pet., supra note 1, ¶¶ 30--31, at 6). Thus, according to Devon, "[t]he PRSA's five-year statute of limitations is . . . inapplicable" to the quiet title claim. Id. at 4.
¶50 Our analysis here can be short-circuited because we have already determined that the Trusts' claim regarding which of two leases controls is best characterized as a quiet title claim, not as a PRSA claim requiring a determination of marketable title. See supra ¶¶ 35--39. Consequently, we agree with Devon that the 5-year statute of limitation appearing in section 570.14(D) of the PRSA is inapplicable. Therefore, Trustees arguments about a specific statute governing over a more general statute are inapposite.
¶51 Nevertheless, the question remains what the appropriate statute of limitation is. Both the trial court and the Court of Civil Appeals found that the 15-year statute of limitation in 12 O.S.2011, § 93(4) applies to the Trust's quiet title claim based on the statutory language of the provision itself and on the utilization of that particular provision in the case of Pangaea Exploration Corp. v. Ryland, 2007 OK CIV APP 106, 173 P.3d 108. See supra notes 52, 86, 88, 94, 104 and accompanying text. We agree based on the plain language of section 93(4).
¶52 A quick review of the statutory provision and its context demonstrates that section 93(4) is the statute of limitation applicable to the Trust's quiet title claim. Chapter 3 in title 12 of the Oklahoma Statutes concerns "LIMITATION OF ACTIONS." 12 O.S.2011, ch. 3. Only two sections in the chapter specify the limitation periods that apply to different types of actions, i.e., sections 93 and 95. See id. Section 93 governs "[l]imitations of real actions," id. § 93; while section 95 governs the "[l]imitation of other actions" like claims based upon written contracts, unwritten contracts, trespass upon real property, conversion of personal property, personal injury, fraud, libel, slander, assault, battery, etc., see id. § 95(A) (listing examples of the types of claims mentioned in the first five of twelve paragraphs under subsection A). The relevant portions of section 93 state:
§ 93 -- Limitations of real actions
Actions for the recovery of real property, or for the determination of any adverse right or interest therein, can only be brought within the periods hereinafter prescribed, after the cause of action shall have accrued, and at no other time thereafter:
(1) An action for the recovery of real property sold on execution, or for the recovery of real estate partitioned by judgment in kind, or sold, or conveyed pursuant to partition proceedings, or other judicial sale, or an action for the recovery of real estate distributed under decree of district court in administration or probate proceedings, when brought by or on behalf of [certain enumerated persons] . . . within five (5) years after the date of [certain occurrences not relevant here] . . . .
(2) An action for the recovery of real property sold by executors, administrators, or guardians, upon an order or judgment of a court directing such sale, brought by [certain enumerated persons] . . . within five (5) years after the date of recording of the deed made in pursuance of the sale.
(3) An action for the recovery of real property sold for taxes, within five (5) years after the date of the recording of the tax deed [subject to certain exceptions and provisos not relevant here] . . . .
(4) An action for the recovery of real property not hereinbefore provided for, within fifteen (15) years.
(5) An action for forcible entry and detention or forcible detention only of real property, within two (2) years.
(6) Numbered paragraphs 1, 2, and 3 shall be fully operative regardless of whether the deed of judgment or the precedent action or proceeding upon which such deed or judgment is based is void or voidable in whole or in part, for any reason, jurisdictional or otherwise; provided that this paragraph shall not be applied so as to bar causes of action which have heretofore accrued, until the expiration of one (1) year from and after its effective date.
Id. § 93. In their quiet title action, Trustees are seeking to recover the leasehold estate held under the 1973 Lease, so that their 1978 Lease will be valid and controlling. Thus, section 93 does apply. Because Trustees aren't seeking to recover real property sold on execution of a judgment or pursuant to partition proceedings, real property sold upon court order in a probate or guardianship case, or real property sold for taxes, their quiet title action is not governed by subsections (1), (2), or (3) of section 93. Instead, Trustees' claim falls under the catch-all provision in subsection (4) that governs all "action[s] for the recovery of real property not hereinbefore provided for." Thus, the applicable statute of limitation is 15 years.
¶53 We further find that Trustees' arguments concerning why the 1973 Lease should be canceled--e.g., that the 1978 Lease was an amendment or a novation of the 1973 Lease, that the merger-of-title doctrine should apply, or that Devon (as a defendant who doesn't bear the burden of proof) somehow failed to present sufficient evidence that the 1973 Lease had been held by continuous production, see supra notes 40, 44, 47, 59, 61, 67, 72, 85 and accompanying text--are all subject to this 15-year statute of limitation. Those arguments would serve as the basis for quieting title in favor of the Trust and against Devon. Thus, we agree with Devon's briefing at the certiorari stage that these "[c]oncepts of novation, modification, and merger are inherently quiet title disputes," Resp't's Answer to Pet. for Writ of Cert. 7, that are subject to section 93(4)'s 15-year statute of limitation.
D. The Trial Court Properly Determined that the Trust's 
Quiet Title Claim Accrued More than 15 Years Ago.
¶54 Trustees' other follow-up question about applying a statute of limitation concerns "when it begins." Appellants' Pet. for Writ of Cert. 10. In other words, we must decide whether the trial court committed reversible legal error by implicitly holding that the Trust's quiet title claim accrued more than 15 years ago, which served as the basis for its explicit holding that the claim is now barred.
¶55 Of all the issues presented on certiorari, this issue receives the most attention from the parties. Yet again, Trustees rely upon the COCA dissent in support of their position:
The dissent further argued that that the cause of action could not begin to run (at the earliest) until the oil and gas was produced and the royalty not properly paid on the Bernhardt wells, since the production from those later wells is the only issue before the trial court and this Court. The dissent correctly based its opinion on Claude C. Arnold Non-Operated Royalty Interest Props., L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817 . . . . The dissent argued that the relevant holding in Arnold is that a cause of action for a claim to royalties on new production does not accrue until a claim for payment is made for the proceeds related to the new production. The dissent quotes Arnold: "('No cause of action accrued until Arnold asserted its right to payment under the still-operative 1973 leases in 2012, and Cabot refused to pay.') On this basis alone, I would reverse the trial court's grant of summary judgment and review the plaintiffs' remaining allegations of error."

Appellants' Pet. for Writ of Cert. 6 (quoting COCA's Op. ¶ 1, at 19 (Blackwell, J., dissenting)). Trustees also suggest that they were lulled into thinking that the 1978 Lease was in force and effect and applied to all wells drilled after its effective date, as demonstrated by the [3]/16 royalty payments that the Trust received from Chesapeake on production from the Justice Well. See id. at 8--9. Therefore, Trustees never knew they needed to question royalty payments until Devon began paying the [1]/8 royalty on production from the Bernhardt Wells. Id. at 8. Lastly, Trustees point to this Court's precedents in Nelson v. Daugherty, 1960 OK 205, 357 P.2d 425, and Harrison v. Eaves, 1942 OK 339, 130 P.2d 841 (per curiam), for the principles that "the limitations period d[oes] not begin to run until the legal effect of the conveyance is questioned or disputed" and that "the statute does not begin to run while both the grantor and the grantee are operating under the belief the deed said one thing, but they later learned it did not reflect their intentions due to a scrivener's error." Appellants' Pet. for Writ of Cert. 8 (quoting Pangaea Expl. Corp., 2007 OK CIV APP 106, ¶ 16, 173 P.3d at 113). By extension, Trustees argue that "[u]ntil [they] questioned the proper payment of the royalty by [Devon] on the new Bernhardt wells, no one had questioned the payment of the royalties even though payments were made using various royalties." Id. Thus, "the SOL would not begin to run until the [Trustees] questioned which royalty rate applied to the Bernhardt wells drilled by [Devon]." Id.
¶56 Devon counters each of these arguments. Devon argues that Trustees "misappl[y] Arnold" insofar as they suggest its holding "requir[es] a demand for payment before the statute of limitations can begin to run":
In Arnold, Arnold had no role in drafting or recording the later-recorded leases (unlike here where the Plaintiff's predecessor and creator of the Eunice S. Justice Trust actually executed both leases), and the facts "indicated neither awareness nor acknowledgement of the [later-recorded] lease's effect on the oil-and-gas formation at issue." 2021 OK 4 at ¶¶ 9, 16. The Court reasoned that the claim for payment in Arnold was the first time the plaintiff was aware of the dispute. Id. That is far from applicable here, as Plaintiff admits as a matter of undisputed fact that she was aware of the application of the 1973 Lease to her interest since 1978, and every year since then. See Devon's Resp. To Pl. Suggestion of Newly Issued Case Law, incorporated herein.

Resp't's Answer to Pet. for Writ of Cert. 4--5 (alteration in original). Devon further argues that Eunice's execution of both the 1978 Lease and the 1979 Division Order "establishes [her] actual knowledge" of "a basis to quiet title . . . so that the terms of the 1978 Lease [would be] applied to the lessor's interest rather than the 1973 Lease agreed to in the Division Order . . . by 1978." Id. at 5, 7--8. Thus, Devon believes the quiet title claim accrued in either 1978 or 1979. See id. at 7--8. Regarding Trustees' argument about receiving a [3]/16 royalty payment on production from the Justice Well, Devon points out that Trustees are "not say[ing] that [they] w[ere] exclusively receiving a 3/16 royalty as of 2006," but are saying "that [they] also received a 3/16 royalty on one well, in addition to a 1/8 royalty on another well, highlighting the fact that the title dispute that began in 1978 was ongoing." Id. at 5. More specifically, "Chesapeake set up its pay decks differently for two separate wells: it attributed a 1/8 royalty to lessors in the 1978 Lena Shawver Well and a 3/16 royalty to lessors in the 2005 Justice Well." Id. at 6. By extension, Devon argues that it "is not a successor-in-interest to the well in which Chesapeake mistakenly credited Plaintiff with a 3/16 interest" and that "the reasons why Chesapeake (or any co-lessee) may have different title analysis could potentially apply as a relevant fact in a lawsuit against Chesapeake, but are entirely irrelevant to quiet title against Devon." Id. Finally, regarding Trustees' invocation of the Nelson and Harrison cases, Devon argues that the principles announced therein are "inapplicable" because "there is no question that Devon and its predecessors have acted contrary to Plaintiff's position and are not in agreement" and because "[t]here is no allegation or defense as to a scrivener's error." Id. at 5.
¶57 Upon weighing the parties' arguments, we conclude that the Trust's quiet title action accrued by at least 1979. "A cause of action accrues when the injury occurs." Calvert v. Swinford, 2016 OK 100, ¶ 11, 382 P.3d 1028, 1033. Said another way, "the statute of limitations begins to run when the cause of action accrues, and the true test to determine when the cause of action accrues is to ascertain the time when the plaintiff could first maintain his action to a successful result." Turner v. Sooner Oil & Gas Co., 1952 OK 171, ¶ 29, 243 P.2d 701, 705 (quoting Nat'l Bank of Claremore v. Jefferies, 1927 OK 278, ¶ 7, 259 P. 260, 261). Here, the alleged "injury" occurred once a second, contemporaneous oil and gas lease was executed and purportedly went into effect in 1978. Once two leases existed and were of record--whether the 1978 Lease could be characterized as a top lease or as a novation or amendment superseding the 1973 Lease--the two leases created a cloud on the competing leasehold interests and on Eunice's mineral interests. Furthermore, once the 1978 Lease purportedly went into effect, Eunice's continued receipt of the [1]/8 royalty payments under the 1973 Lease constituted an injury. Either way, the undisputed material facts demonstrate the Trust's injury occurred in 1978, which means the quiet title claim accrued in 1978. Thus, the trial court did not err in finding that the 15-year statute of limitations in 12 O.S.2011, § 93(4) had run.
¶58 We do not accept Trustees' argument that the injury occurred in 2017 when Devon first paid them a [1]/8 royalty on production from the Bernhardt Wells. Trustees' suggestion that "no one had [previously] questioned the payment of the royalties even though payments were made using various royalties" because "the parties recognized the 1/8 royalty in [the] 1973 Lease for wells drilled prior to December 4, 1978, and the 3/16 royalty in the 1978 Lease for wells drilled after December 4, 1978," is only a recent development at the certiorari stage. See Appellants' Pet. for Writ of Cert. 8--9. This suggestion is wholly inconsistent with earlier statements made by Trustees' attorney in prelitigation correspondence with the lessees for all three wells that "[t]he Second Lease . . . became effective on December 4, 1978 and all subsequent distributions should have been made based upon the 3/16ths royalty as provided in the Second Lease" and that "[m]y clients . . . should have been paid the 3/16th royalty on the Lena Shawver #1 effective December 4, 1978." See 11/22/2017 Letter to Chesapeake, supra note 19, at 1--2 (emphasis added); 11/22/2017 Letter to Devon, supra note 35, at 1 (emphasis added).[120] It also runs contrary to Chesapeake's conclusion in prelitigation correspondence that "the lessor had nothing to lease when the second lease [i.e., the 1978 Lease] was executed" and that "Chesapeake would have a counterclaim against the trust" for overpayment of royalties. See supra note 82 and accompanying text.
¶59 We also find unpersuasive Trustees' argument that under Claude C. Arnold Non-Operated Royalty Interest Properties, L.L.C. v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817, no cause of action accrued until they asserted their right to a [3]/16 royalty payment for production from the Bernhardt Wells and Devon refused to pay. Rather, we agree with Devon and with the COCA majority that the Arnold case is distinguishable from this case.
¶60 In Arnold, the plaintiff Claude C. Arnold Non-Operated Royalty Interest Properties, L.L.C. (hereinafter "Arnold") was the owner of an overriding royalty (ORR) interest that its predecessor-in-interest, Arnold Petroleum, Inc., reserved upon assignment of several leases executed in 1973. Id. ¶¶ 0, 5, 485 P.3d at 818--19. Prior to expiration of the primary term in 1976, the assignee's successor-in-interest, Harold Courson, drilled two vertical wells into the Chester formation, for which Arnold continually received ORR payments. Id. ¶ 5, 485 P.3d at 819. In 1984, Courson executed new leases that purported to cover the same rights as the original 1973 leases; but Arnold was never aware of the 1984 leases until 1999, when it received a letter from Courson about a third well being recompleted. Id. ¶ 6, 485 P.3d at 819. That third well had been drilled under the 1984 leases by Natural Gas Anadarko, Inc. into the separate Lower Chester formation, and Courson explained to Arnold's representative that the 1984 leases covered only the "lower depths" that weren't covered by the 1973 leases. Id. In 2011, Courson assigned his leases to the defendant, Cabot Oil & Gas Corporation, who then drilled two horizontal wells into a different formation, i.e., the Marmaton formation. Id. ¶ 7, 485 P.3d at 819. In 2012, Arnold contacted Cabot to request payment of its ORR interest on production from the new wells, taking the position that its rights in the Marmaton formation were held by virtue of certain provisions in the 1973 leases. Id. ¶ 7, 485 P.3d at 819--20. Cabot refused payment, precipitating Arnold's lawsuit to quiet title as to the Marmaton formation in its favor. Id. ¶ 8, 485 P.3d at 820. Cabot argued Arnold's claims were barred under the applicable 15-year statute of limitation in 12 O.S.2011, § 93(4) because the cloud over plaintiff's ORR interest was created when the 1984 leases were filed. Id. The trial court determined that Arnold's cause of action accrued in 2012, when Arnold requested payment from Cabot. Id. On appeal we affirmed the trial court, finding that "no injury occurred to Arnold before July 2012, when it first requested payment of its overriding royalty interest" and that "[n]o cause of action accrued until Arnold asserted its right to payment under the still-operative 1973 leases in 2012, and Cabot refused to pay." Id. ¶¶ 12--13, 485 P.3d at 821. This, of course, is the language that Trustees latch onto in their argument about when their claim accrued.
¶61 Central to our holding in the Arnold case was our determination that "Arnold had no role in drafting or recording the 1984 leases, which were entirely silent about the Marmaton formation. This compels us to wonder what injury--or what 'cloud'--the plaintiffs should have reasonably been expected to uncover in 1984, in 1999, or at the start of 2012. . . . From 1984 to 2012, nothing could reasonably alert even a sophisticated party like Arnold about an adverse claim to its Marmaton interest." Id. ¶ 16, 485 P.3d at 822. The fact that Arnold played no part in executing or recording the subsequent leases "set[] th[e] case apart from the situation discussed in our . . . decisions in Scott v. Peters, 2016 OK 108, 388 P.3d 699, and Calvert v. Swinford, 2016 OK 100, 382 P.3d 1028. In those cases, the plaintiffs attempting to avoid the effect of the statute of limitations were the grantors of the mineral deeds in question. There, we held the statute-of-limitations period began to run when the deeds were filed with the county clerk. It is completely reasonable to expect that the grantor who negotiates, reads, and signs the instrument should be 'on notice' of what it says from the time of filing onward." Arnold, 2021 OK 4, ¶ 15, 485 P.3d at 822 (second emphasis added).
¶62 The present case is more akin to Calvert and Scott than to Arnold. Eunice executed both the 1973 Lease and the 1978 Lease. Thus, it is reasonable to expect that she--as lessor who negotiated, read, and signed both leases--should be on notice of the potential conflict between the two leases and the cloud created when the second lease purportedly became effective. We cannot say, as we did in Arnold, that Eunice played no role in drafting or recording the second lease. For these reasons, we find Trustees' reliance upon the Arnold case unpersuasive.
¶63 Similarly, we find unpersuasive Trustees' argument that under Nelson v. Daugherty, 1960 OK 205, 357 P.2d 425, and Harrison v. Eaves, 1942 OK 339, 130 P.2d 841 (per curiam), the 15-year statute of limitation did not begin to run until they questioned or disputed the legal effect of the conveying instruments (i.e., the 1973 Lease and the 1978 Lease) in 2017. Those cases involved equitable claims to reform either a deed or a trust, respectively, that contained a typographical error and the equitable tolling of the applicable statute of limitation on account of mutual mistake. See Nelson, 1960 OK 205, ¶¶ 6, 28, 33--34, 357 P.2d at 427, 432--34, discussed in Scott, 2016 OK 108, ¶¶ 16--18 & n.10, 388 P.3d at 703 & n.10; Harrison, 1942 OK 339, ¶¶ 1--2, 8, 130 P.2d at 843--44, cited in Calvert, 2016 OK 100, ¶ 16 n.36, 382 P.3d at 1035 n.36. As Devon points out, Trustees have not alleged the existence of any scrivener's error in the 1978 Lease, and the conduct of the parties does not support an argument of mutual mistake.
E. The Trial Court's Denial of Trustees' Motion to Compel 
Production of Title Opinions Need Not Be Reversed.
¶64 For their last issue raised on certiorari, Trustees ask "whether a trial court can determine when any S[tatute ]O[f ]L[imitations] period begins without the benefit of reviewing a title opinion or other similar record reflecting marketable title--as required by the PRSA--before production payment decisions can be made." Appellants' Pet. for Writ of Cert. 10. In other words, they want us to decide whether the trial court committed legal error by failing to grant their motion to compel Devon's production of the various title opinions in their possession.
¶65 We need not reach that issue. We have already observed that the issue of whether Trustees hold marketable title is distinct from the issue of which lease controls between the 1973 Lease and the 1978 Lease, that Trustees' establishment of "marketable title" would not help in narrowing down which lease controls, and that the parties don't even dispute whether the Trust has marketable title as demonstrated by Devon's payment of royalties to the Trust. See supra ¶ 38. Thus, Trustees' justification for production of the title opinions--i.e., that the title opinions were relevant for determining whether "marketable title" exists--is null and void. Moreover, in light of our determination that Trustees' quiet title claim is barred by the applicable statute of limitation, see supra ¶ 57, Trustees' PRSA claims for accounting and back-payment on underpaid royalties fail by extension because--as previously argued by Devon and admitted by Trustees--those PRSA claims are derivative and therefore dependent on the survival of their quiet title claim. See supra notes 56, 74 and accompanying text. Thus, the only claims to which the title opinions are relevant have been wiped out. Consequently, there is no basis for reversing the trial court's denial of Trustees' motion to compel.
IV. CONCLUSION
¶66 In conclusion, we determine that the trial court did not err in applying a statute of limitation, in general, to Trustees' quiet title claim; that the trial court did not err in applying the 15-year statute of limitation from 12 O.S.2011, § 93(4), in particular, to Trustees' quiet title claim; that the trial court did not err in determining that the Trustees' quiet title claim accrued more than 15 years ago; and that the trial court did not err in denying Trustees' motion to compel the production of various title opinions in Devon's possession. A de novo review of the record shows the trial court's decision granting Devon's motion for summary judgment must be affirmed. Because the trial court correctly granted summary judgment, the trial court did not abuse its discretion in denying Trustees' motion for new trial.
OPINION OF THE COURT OF CIVIL APPEALS VACATED; 
JUDGMENT OF THE DISTRICT COURT AFFIRMED; 
CASE REMANDED FOR FURTHER PROCEEDINGS 
NOT INCONSISTENT WITH THIS OPINION.
KAUGER, WINCHESTER, EDMONDSON, COMBS, GURICH, and DARBY, JJ., concur.
ROWE, V.C.J., and KUEHN, J. (by separate writing), concur in result.
KANE, C.J., dissents.
FOOTNOTES
[1] ROA, Doc. 2, Pet. ¶ 20, at 4 [hereinafter Pet.].
[2] Id. ¶¶ 19--20, at 4; id. at Ex. D, Warranty Deed 1 (Apr. 6, 1990) (wherein Eunice and her husband conveyed their land and mineral interests in the N/2 NE/4 of Section 8-15N-9W to the Eunice S. Justice 1990 Revocable Trust under Agreement dated the 12th day March 1990); id. at Ex. E, Kaye Frances Base's Aff. of Successor Trustee ¶¶ 2--3, at 1 (May 31, 2016) (summarizing the revisions made to the Trust in 2011).
[3] ROA, Doc. 5, Def.'s Mot. Summ. J. ¶ 4, at 3 [hereinafter Def.'s Mot. Summ. J.]; id. at Ex. 2, Quit Claim Deed 1 (June 16, 1977); ROA, Doc. 6, Pls.' Resp. to Def.'s Mot. Summ. J. ¶ 4, at 5 [hereinafter Pls.' Resp.].
[4] Def.'s Mot. Summ. J., supra note 3, ¶ 2, at 1--2; id. at Ex. 1, Oil & Gas Lease 1 (Dec. 4, 1973) [hereinafter 1973 Lease]; Pls.' Resp., supra note 3, ¶ 2, at 7.
[5] Def.'s Mot. Summ. J., supra note 3, ¶ 2, at 1--2; 1973 Lease, supra note 4, ¶ 2, at 1; Pls.' Resp., supra note 3, ¶ 2, at 7.
[6] Def.'s Mot. Summ. J., supra note 3, ¶ 2, at 1--2; 1973 Lease, supra note 4, ¶ 4, at 1; Pls.' Resp., supra note 3, ¶ 2, at 7.
[7] Def.'s Mot. Summ. J., supra note 3, ¶ 5, at 3; id. at Ex. 3, Assignment & Conveyance 1, 3 (Aug. 1, 1977); Pls.' Resp., supra note 3, ¶ 5, at 5.
[8] Def.'s Mot. Summ. J., supra note 3, ¶ 6, at 3; id. at Ex. 4, Oil & Gas Lease 1 (July 24, 1978) [hereinafter 1978 Lease].
[9] Def.'s Mot. Summ. J., supra note 3, ¶ 6, at 3 & n.2; 1978 Lease, supra note 8, ¶¶ 2, 5, at 1.
[10] Def.'s Mot. Summ. J., supra note 3, ¶ 6, at 3; 1978 Lease, supra note 8, ¶¶ 3--4, at 1.
[11] See Def.'s Mot. Summ. J., supra note 3, at Ex. 5, Okla. Corp. Comm'n Completion Report (Form 1002A) at 1 (Jan. 29, 1979) [hereinafter Form 1002A]; Pls.' Resp., supra note 3, ¶ 22, at 12; id. at Ex. 10, OCC Records Pertaining to Petro-Lewis Corp. 1 [hereinafter OCC's Records on Petro-Lewis Corp.] (showing that Petro-Lewis Corp. filed an application to pool drilling rights in Section 8-15N-9W on June 12, 1978); id. at Ex. 20, OCC Records for Lena Shawver #1 & Justice #1-8, at 31 [hereinafter OCC's Records for Wells] (showing a Notice of Change of Operator (Form 1073) that transferred operations from Petro Lewis Corp. to NICOR Exploration Corp. effective May 24, 1985).
[12] Form 1002A, supra note 11, at 1 (showing the location of the well in the N/2 NE/4 of Section 8-15N-9W); Pls.' Resp., supra note 3, ¶ 13, at 9; OCC's Records on Petro-Lewis Corp., supra note 11, at 10--13 (showing the pooling order entered by the Corporation Commission).
[13] Def.'s Mot. Summ. J., supra note 3, ¶ 7, at 3; Form 1002A, supra note 11, at 1.
[14] Def.'s Mot. Summ. J., supra note 3, ¶ 7, at 3; Form 1002A, supra note 11, at 1.
[15] Def.'s Mot. Summ. J., supra note 3, ¶ 10, at 4; id. at Ex. 9, Gas Division Order 1 (July 6, 1979) [hereinafter 1979 Gas Division Order].
[16] Id. at Ex. 9, Gas Division Order 1 (Nov. 6, 1980) [hereinafter 1980 Gas Division Order].
[17] See Pls.' Resp., supra note 3, at Ex. 26, Division Orders & Other Docs. 19--20 [hereinafter Division Orders & Other Docs.] (showing a Division Order from NICOR Exploration Company signed by Eunice).
[18] See 1979 Gas Division Order, supra note 15, at 1; 1980 Gas Division Order, supra note 16, at 1.
[19] Def.'s Mot. Summ. J., supra note 3, ¶ 11, at 4 (asserting that Eunice "accept[ed] royalty payments pursuant to the 1973 Lease for well over 15 years"); id. at Ex. 10, Payments Spreadsheet (summarizing payments for production from the Shawver Well between February 25, 2002, and December 31, 2018, at a decimal royalty interest of 0.01562500); Pls.' Resp., supra note 3, ¶ 11, at 6 (disputing whether "the 1/8 royalty term is the proper royalty term" but not disputing that Eunice had received payments for a [1]/8 royalty); id. at Ex. 2, 11/22/2017 Letter from Richard K. Goodwin to Chesapeake Operating, Inc. & Gastar Exploration 2 [hereinafter 11/22/2017 Letter to Chesapeake] (wherein the Trust's attorney concedes that "[his] clients have been paid a 1/8th royalty on the Lena Shawver #1 production").
[20] 11/22/2017 Letter to Chesapeake, supra note 19, at 2 (wherein the Trust's attorney concedes that "[his] clients have been paid a 1/8th royalty on the Lena Shawver #1 production"); Pls.' Resp., supra note 3, at Ex. 21, Concho Revenue 1 (showing a royalty payment that Concho Exploration, Inc. made on March 22, 2004, for production from the Shawver Well using a decimal interest of 0.01562500); id. at Ex. 25, Chesapeake Revenues 1--3, 10, 19, 42, 67, 71, 73, 75--77, 79--80, 82 [hereinafter Chesapeake Revenues] (showing royalty payments that Chesapeake Operating Inc. made over a sixteen-year course--i.e., in December 2004, October 2005, July 2007, November 2008, July 2009, June 2011, December 2014, May 2016, June 2017, January 2019, March 2019, May 2019, July 2019, November 2019, and February 2020--for production from the Shawver Well using a decimal interest of 0.01562500); id. at Ex. 22, Mustang Revenues 1--119 (showing royalty payments that Mustang Gas Products, LLC made on an almost monthly basis during 2006, 2007, 2009, 2010, 2011, 2012, 2013, 2014, the first half of 2015, the last half of 2019, and the first half of 2020 for production from the Shawver Well using a decimal interest of 0.0208333, which would be equivalent to a [1]/6 royalty on half of a quarter--i.e., the N/2 of the NE/4--of Section 8-15N-9W); see also Divisions Orders & Other Docs., supra note 17, at 17 (showing a Division Order from Mustang Gas Products, LLC signed by Kaye Base as Trustee that lists a royalty interest of 0.02083330 on production from the Shawver Well).
[21] See Def.'s Mot. Summ. J., supra note 3, ¶ 8, at 4; id. at Ex. 6, Assignment of Overriding Royalty Interest 1, 3 (Nov. 7, 1978) (wherein Petro-Lewis Funds, Inc. assigned an over-riding royalty interest in the 1978 Lease to Petro-Lewis Agency Corp.); id. at Ex. 7, Assignment of Oil & Gas Lease 1, 3 (Mar. 22, 1979) (wherein Petro-Lewis Funds, Inc. and Petro-Lewis Agency Corp. assigned all their interests as lessee under the 1978 Lease to Partnership Properties Co.); Pls.' Resp., supra note 3, ¶ 8, at 5 ("Plaintiff [sic] agree that on March 22, 1979 Partnership Properties, Inc. was the owner of both the 1973 Lease and the 1978 Lease."); id. ¶ 11, at 8 ("Based on the above, on March 22, 1979, all of the 1973 Lease and the 1978 Lease were owned by Partnership Properties Co.").
Despite the parties' agreement on this fact, the record on appeal seems to suggest that Petro-Lewis Funds, Inc. retained an interest in the Shawver Well and its formation until 1985, when all rights under the 1973 Lease were assigned, sold, and conveyed to Nicor Exploration Company. See Def.'s Mot. Summ. J., supra note 3, at Ex. 8, 1973 Lease Run Sheet 1 [hereinafter 1973 Lease Run Sheet] (discussing an assignment made April 4, 1979, wherein Partnership Properties Co. purported to make a limited assignment of its interests under the 1973 Lease in the Chester formation to Petro-Lewis Funds, Inc. effective as of November 27, 1978--i.e., the date of the Shawver Well's first production from the Chester formation--but reserving all interests under the 1973 Lease in other formations); Pls.' Resp., supra note 3, at Ex. 6, Assignment of Oil & Gas Leases dated 04-05-79, at 1; id. at Ex. 19, Assignment, Bill of Sale & Conveyance dated 1/1/85, at 1, 7.
[22] Def.'s Mot. Summ. J., supra note 3, ¶ 9, at 4; 1973 Lease Run Sheet, supra note 21, at 1; Pls.' Resp., supra note 3, ¶ 9, at 6 (failing to dispute that since 1979 a total of 56 assignments were made of the 1973 Lease alone); id. at Ex. 6, Assignment of Oil & Gas Leases dated 04-05-79, at 1; id. at Ex. 15, Assignment, Bill of Sale & Conveyance (LVP) effective 12/31/84, at 1, 10 (wherein all of the Petro-Lewis entities assigned, sold, and conveyed their interests in the 1973 Lease (i.e., Book 492, Page 266) to PLC-ARPC, Inc.); id. at Ex. 19, Assignment, Bill of Sale & Conveyance dated 1/1/85, at 1, 7 (wherein Partnership Properties Co., Petro-Lewis Corp., Petro-Lewis Funds Inc., and PLC-ARPC, Inc. assigned, sold, and conveyed their interests in the 1973 Lease (i.e., Book 492, Page 266) to NICOR Exploration Company).
[23] Pls.' Resp., supra note 3, ¶ 22, at 12; OCC's Records for Wells, supra note 11, at 37 (showing a Form 1073 that transferred operations of the Shawver Well from Concho Exploration Inc. to Chesapeake Operating Inc. on June 4, 2004).
[24] See 1973 Lease Run Sheet, supra note 21, at 2 (explaining that a predecessor-in-interest under the 1973 Lease and previous operator, Ricks Exploration, Inc., assigned all its interests under the 1973 Lease in May of 2000 to Ricks Exploration II, L.P., who later "merged into Concho Oil and Gas, which Concho merged with Chesapeake"; also showing assignments made in 2005 and 2006 to Chesapeake Exploration Limited Partnership).
[25] OCC's Records for Wells, supra note 11, at 4 (showing an Application to Drill, Recomplete or Reenter (Form 1000) that Chesapeake filed with the Corporation Commission on August 30, 2007, to drill the Justice #1-8 well to a depth of 11,315 feet--at least 2,500 feet deeper than the Mississippi Chester Lime).
[26] Pls.' Resp., supra note 3, ¶ 21, at 12; OCC's Records for Wells, supra note 11, at 17 (showing the Completion Report (Form 1002A) for the Justice Well).
[27] OCC's Records for Wells, supra note 11, at 17.
[28] Division Orders & Other Docs., supra note 17, at 2--3 (showing a division order from Chesapeake signed by Eunice on behalf of the Trust).
[29] Pls.' Resp., supra note 3, ¶ 11, at 6 (stating that "Plaintiffs received a 3/16 royalty from other operators pursuant to the 1978 Lease"); 11/22/2017 Letter to Chesapeake, supra note 19, at 2 (wherein the Trust's attorney states that "[his] clients have been paid . . . a 3/16th royalty on the Justice #1-8 well"); id. at Ex. 23, Gastar Revenues 1--55 (showing royalty payments that Gastar Exploration LLC made over a six-year course--i.e., payments on a monthly basis from September 2013 to January 2018 and additional payments in November 2018, March 2019, and August 2019--for production from the Justice Well using a decimal interest of 0.02343750, which is equivalent to a [3]/16 royalty interest on half of a quarter--i.e., the N/2 of the NE/4--of Section 8-15N-9W); Chesapeake Revenues, supra note 20, at 4--9, 11--18, 20--39, 41, 43--66, 68--71 (showing royalty payments that Chesapeake made over a eight-year course--i.e., payments on a monthly basis from June 2008 to June 2013 and additional payments in December 2014, May 2015, August 2015, and May 2016--for production from the Justice Well using a decimal interest of 0.02343750).
[30] See 1973 Lease Run Sheet, supra note 21, at 1--3 (showing a 1995 assignment from Ricks Exploration to Twister Gas Services LLC inter alia, a 2010 assignment from Twister Gas Services LLC to Wynn-Crosby Partners II Ltd., a 2015 assignment from Wynn-Crosby Partners II Ltd. to Felix Energy LLC, and two 2015 assignments from Felix Energy LLC to Felix Energy Holdings LLC); Division Orders & Other Docs., supra note 17, at 26 (showing a letter from Devon to Trustees dated April 29, 2016, wherein Devon stated that it "ha[d] recently acquired assets from Felix Energy, LLC located in Kingfisher, Custer, Blaine, Dewey and Canadian Counties, Oklahoma"); Pls.' Resp., supra note 3, at Ex. 27, Articles of Merger 1--4 (showing Articles of Merger and a Certificate of Merger that state Felix Energy, LLC and Felix Energy Holdings, LLC were merged into Devon effective January 12, 2016); Def.'s Mot. Summ. J., supra note 3, ¶ 1, at 2 ("Devon is the owner of a leasehold interest in the N/2 NE/4 of Section 8, Township 15 North, Range 9 West, Kingfisher County, Oklahoma (the "Subject Property") by virtue of the Oil and Gas Lease, dated December 4, 1973 (the "1973 Lease"), between Lena Shawver (life tenant) and Eunice S. Justice (remainderman) as lessors, and the Rodman Corporation as lessee. . . . Devon is a successor in interest to the lessee of the 1973 Lease."); ROA, Doc. 11, Def.'s Reply in Support of Its Mot. Summ. J. 8 & Ex. 12 [hereinafter Def.'s Reply] (asserting that Devon owns an interest in the 1973 Lease and attaching a copy of the Certificate of Merger filed in the Kingfisher County Clerk's land records at Book 2854, Pages 463--467).
[31] See Def.'s Mot. Summ. J., supra note 3, at 1--2; see also ROA, Doc. 12, Def.'s Resp. to Pl.'s [sic] Mot. to Compel 1 [hereinafter Def.'s Resp. to Pls.' Mot. to Compel] (showing that Felix Energy, LLC had obtained a drilling title opinion concerning the Bernhardt Wells in June of 2015).
[32] Id. at 1--2 & n.1. Devon apparently drilled a ninth well also--i.e., the Bernhardt 8_5-15N-9W 10HX well--but plugged that well in May of 2019. Id. at 2 n.1.
The record on appeal reveals that the Bernhardt 8_5-15N-9W 1HX well was spud in Section 17-15N-9W of Kingfisher County, but the multi-unit horizontal well extends north into the 640-acre spacing unit in Section 8-15N-9W. See Pls.' Resp., supra note 3, at Ex. 24, Devon Revenues 2 [hereinafter Devon Revenues]. Although it is not clear from the record on appeal where the other seven producing wells were spud, the parties do not dispute that the Bernhardt Wells are producing at least in part from the 640-acre spacing unit in Section 8-15N-9W. Pet., supra note 1, ¶ 2, at 2 (wherein the Trust alleges that "[t]he Bernhardt Wells are producing from the common sources of supply that have been spaced as 640-acre drilling and spacing units covering all of said Section 8"); ROA, Doc. 4, Am. Answer of Def. ¶ 2, at 1 [hereinafter Am. Answer of Def.] (wherein Devon "admits that the Bernhardt Wells are producing from common sources of supply that have been spaced as 640-acre drilling and spacing units covering all of Section 8").
[33] See Devon Revenues, supra note 32, at 2--5; Pet., supra note 1, ¶ 14, at 3. But see Am. Answer of Def., supra note 32, ¶ 14, at 2 (denying either that the Bernhardt Wells commenced producing on July 3, 2017, or that production continues to this day).
[34] The decimal interest listed in Devon's payment records for the Bernhardt 8_5-15N-9W 1HX well is 0.00750313. Devon Revenues, supra note 32, at 2--5. That decimal interest is equivalent to a [1]/8 royalty payment because Section 8 is allocated 48.02% of the production from this multi-unit well that stretches over three sections (i.e., Sections 5, 8, and 17) in Township 15 North, Range 9 West. See ROA, Doc. 9, Pls.' Mot. for Leave of Ct. to Suppl. Pls.' Resp. to Def.'s Mot. Summ. J. at Ex. S, E-mail Report 4 (wherein Sandra Stewart, a Senior Division Order Analyst for Devon, explained the decimal interest to Trustee Kaye Base by e-mail dated October 19, 2017). Thus, for production from the Bernhardt 8_5-15N-9W 1HX well, Devon is paying the Trust 48.02% of a [1]/8 royalty payment for half (N/2) of one-quarter (NE/4) of Section 8--i.e., 0.4802 × [1]/8 × [1]/2 × [1]/4 = 0.00750313.
[35] In both prelitigation letters and their petition, Trustees claim that Devon has been paying the Trust a [1]/8 royalty payment on production from all the Bernhardt Wells pursuant to the 1973 Lease. See Pet., supra note 1, ¶ 15, at 3 (wherein the Trust alleges that "Devon has been paying to the Plaintiffs revenue from production based on a 1/8 royalty on the Bernhardt Wells from the date of first production to the present"); 11/22/2017 Letter to Chesapeake, supra note 19, at 1 (wherein the Trustees' attorney tells Chesapeake that "Devon credits my clients with the 1/8th royalty stated in the Fist Lease"); Pls.' Resp., supra note 3, at Ex. 3, 11/22/2017 Letter from Richard K. Goodwin to Devon Energy Prod. Co. LP 1 [hereinafter 11/22/2017 Letter to Devon] (wherein the Trustees' attorney faults Devon because the Division Order Title Opinion upon which Devon relies "credits my clients with the 1/8th royalty stated in the First Lease"). In its answer, however, Devon inexplicably denies that its payments to the Trust have been "based on a 1/8 royalty on the Bernhardt Wells from the date of first production to the present," see Am. Answer of Def., supra note 32, ¶ 15, at 2, but fails to suggest an alternative royalty interest upon which its payments have been based. The parties have not included in the record on appeal a proposed Division Order for any of the Bernhardt Wells, which presumably would have shed some light on the decimal interests for the other seven wells.
[36] See 11/22/2017 Letter to Chesapeake, supra note 19, at 1 (mentioning "division orders received from Devon"). Incidentally, it appears the Trustees never signed Devon's proposed division order. See Pls.' Resp., supra note 3, at 16 (" . . . Plaintiffs have not signed any division order submitted by Devon.").
[37] See 11/22/2017 Letter to Devon, supra note 35, at 1 (implying that previous correspondence had requested a title opinion that Devon had since provided).
[38] See Pls.' Resp., supra note 3, at Ex. 1, 10/25/2017 Letter from Richard K. Goodwin to Chesapeake Operating, Inc. et al. 1 ("Please provide the relevant portions of the Division Order Title Opinion(s) for the Justice #1-8 well involving the Justice interest."); 11/22/2017 Letter to Chesapeake, supra note 19, at 1 ("By letter dated October 25, 2017, I requested copies of the title opinion for the Justice #1-8 well. I have not received any response to my letter. By this letter I am requesting copies of all title opinions in your possession or available to you covering Section 8-15N-9W, Kingfisher County, Oklahoma, including but not limited to any opinions covering the above described wells [i.e., the Lena Shawver #1 well and the Justice #1-8 well].").
[39] 11/22/2017 Letter to Devon, supra note 35, at 1--3 ("You have supplied a copy of portions of the Division Order Title Opinion dated September 27, 2017 from Walker, Ferguson & Ferguson (Opinion) . . . . I was provided with pages 1, 8, 9, 10, and 58 of the Opinion. . . . Prior to taking any legal action, I would like to review complete copies of all available title opinions for Section 8. I have requested title opinions from Chesapeake Operating, Inc. and Gastar Exploration Inc. They have not responded to my request. I would request a complete copy of any title opinions in your possession or available to you covering Section 8-15N-9W, Kingfisher County, Oklahoma.").
[40] Id. at 2; see also Pls.' Resp., supra note 3, at Ex. 4, 03/22/2018 Letter from Richard K. Goodwin to Devon Energy Prod. Co. LP 1--2 [hereinafter 03/22/2018 Letter to Devon] (advancing the same argument: "Based on the prior opinions and the pooling actions by Petro-Lewis Corporation in Cause CD No. 780005848 and the applicable Oklahoma statutes and case law, the oil and gas lease at Book 601, Page 425 [i.e., the 1978 Lease], either amended or replaced the prior oil and gas lease at Book 492, Page 266 [i.e., the 1973 Lease].").
[41] 11/22/2017 Letter to Devon, supra note 35, at 2; 03/22/2018 Letter to Devon, supra note 40, at 2--3 (advancing the same argument: "Pooling order No. 143396 dated July 21, 1978 is enclosed. The applicant was Petro-Lewis Corporation. Paragraph 4 of the Findings states: '4. That Applicant is the owner of drilling rights in said Section 8 and proposes, as operator, to drill a well . . .' From my review of the lease and assignment analysis made in the opinions, Petro-Lewis Corporation never acquired any title to any oil and gas lease. I cannot recall the names of all of the Petro-Lewis entities, but I would be certain that Petro-Lewis Corporation or maybe Petro-Lewis Funds, Inc. controlled all of the various entities, including Partnership Properties Co. All of the Petro-Lewis organization should and would be considered one and the same such that the second oil and gas lease was a substitution of the first lease or a modification of the first leases [sic] or novation of the first lease.").
[42] Pls.' Resp., supra note 3, at Ex. 9, 04/05/2018 Letter from Cherish K. Ralls, Devon Energy Prod. Co., L.P., to Richard K. Goodwin 1; see also ROA, Doc. 8, Pls.' Mot. to Compel at Ex. G, Devon's Privilege Log 1 (disclosing that Devon possessed the October 2006 title opinion for the Justice Well prepared for Chesapeake by Wright & Associates, P.C.); Def.'s Resp. to Pls.' Mot. to Compel, supra note 31, at Ex. 6, Devon's Am. Privilege Log 1 (disclosing that Devon possessed the June 2015 title opinion for the Bernhardt Wells prepared for Felix Energy, LLC by Deen & Garretson, and the September 2017 title opinion for the Bernhardt Wells prepared for Devon by Walker Ferguson & Ferguson, and the November 2017 supplemental title opinion prepared for Devon by Walker Ferguson & Ferguson).
[43] Pet., supra note 1, at 1.
[44] Id. ¶¶ 22--25, at 5.
[45] Id. ¶¶ 26--28, at 5.
[46] Id. ¶¶ 29--31, at 6.
[47] Id. ¶ 24, at 5.
[48] ROA, Doc. 3, Answer of Def. 1 [hereinafter Answer of Def.]; Am. Answer of Def., supra note 32, at 1.
[49] Answer of Def. 1, supra note 48, ¶¶ 3, 6, 13, at 5--6; Am. Answer of Def., supra note 32, ¶¶ 3, 6, 14, at 5--6.
[50] See ROA, Doc. 8, Pls.' Mot. to Compel ¶¶ 7--16, at 2--4 [hereinafter Pls.' Mot. to Compel] (summarizing the exchange of written discovery from May 15, 2019, to December 17, 2019).
[51] Def.'s Mot. Summ. J., supra note 3, at 1.
[52] Id. at 1, 5 (citing 12 O.S.2011, § 93(4); Pangaea Expl. Corp. v. Ryland, 2007 OK CIV APP 106, ¶¶ 11--12, 173 P.3d 108, 112).
[53] Id. at 1, 5; see supra note 15 and accompanying text.
[54] Def.'s Mot. Summ. J., supra note 3, at 5.
[55] Id. at 6.
[56] Id. at 7.
[57] Pls.' Resp., supra note 3, at 1.
[58] Id. at 14 ("Of the eleven (11) 'undisputed' facts asserted by Plaintiff [sic] in support of summary judgment, Plaintiffs dispute all or part of nine (9) of them.").
[59] Id. ¶¶ 1--3, 7, 11, at 5--6 (challenging Undisputed Facts # 1, 2, 3, 7, and 11).
[60] Id. ¶ 6, at 5 (challenging Undisputed Fact # 6).
[61] Id. ¶ 7, at 5 (challenging Undisputed Fact # 7).
[62] Id. ¶ 10, at 6 (challenging Undisputed Fact # 10).
[63] Id. at 14.
[64] Id. ¶¶ 13--20, at 9--12.
[65] Id. at 4--5; see also supra notes 20, 29 and accompanying text (listing exhibits to Trustees' summary judgment response that show what royalty payments the Trust received on the Shawver Well and the Justice Well).
[66] Pls.' Resp., supra note 3, at 18.
[67] Id. at 1--2, 15.
[68] Id. at 2.
[69] Id. at 16.
[70] Id. at 19.
[71] Id. at 17 (citing 3 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 39.5 (2010)).
[72] Id. at 20.
[73] Id. at 15; see also id. at 14, 16 ("At its core, this case is a dispute over the proper royalty rate to be paid to Plaintiffs on the Bernhardt wells. It is not a dispute over the royalty paid on the Lena Shawver #1 well or the Justice 1-8 well. . . . Plaintiffs are not seeking any change, at this time, to the distributions for the older wells, Lena Shawver #1 and Justice 1-8 -- just the new Bernhardt Wells.").
[74] Id. at 20.
[75] Pls.' Mot. to Compel, supra note 50, at 11.
[76] ROA, Doc. 9, Pls.' Mot. for Leave of Ct. to Suppl. Pls.' Resp. to Def.'s Mot. Summ. J. 14.
[77] Def.'s Reply, supra note 30, at 1--2.
[78] Id. at 2--3.
[79] Id. at 4--6.
[80] Id. at 7.
[81] Id. at 7--8.
[82] Id. at 6--7; id. at Ex. 11, 01/29/2018 Letter from Jason P. Blose, Managing Att'y, Chesapeake Energy Corp., to Richard K. Goodwin, Esq. 1.
[83] ROA, Doc. 10, Def.'s Resp. to Pl.'s [sic] Mot. for Leave to Suppl. Its [sic] Resp. & Mot. to Strike 1; Def.'s Resp. to Pls.' Mot. to Compel, supra note 31, at 1.
[84] ROA, Doc. 15, Tr. of Proceedings 4:24--5:2, 7:4--:9, 8:2--9:2, July 15, 2020.
[85] Id. at 4:6--:13, 5:6--:8.
[86] Id. at 6:2--:13.
[87] Id. at 6:15--7:1, 7:18--:22.
[88] Id. at 9:7--:14.
[89] Id. at 9:20--:22.
[90] Id. at 9:23.
[91] Id. at 10:6--:11.
[92] Id. at 10:13--:18.
[93] See ROA, Doc. 16, Pls.' Mot. in Supp. of Pls.' Proposed Order Denying Pls.' Mot. to Compel 1; ROA, Doc. 17, Pls.' Mot. in Supp. of Pls.' Proposed Order Denying Pls.' Mot. for Leave of Ct. to Suppl. Its Resp. to Def.'s Mot. Summ. J. 1; ROA, Doc. 18, Pls.' Mot. in Supp. of Pls.' Proposed Order Granting Def.'s Mot. Summ. J. 1; ROA, Doc. 19, Def.'s Consol. Resp. & Cross Mot. to Settle 1.
[94] See ROA, Doc. 20, Order Denying Pl.'s [sic] Mot. for Leave of Ct. to Suppl. Its Resp. to Def.'s Mot. Summ. J. 1; ROA, Doc. 21, Order Denying Pl.'s [sic] Mot. to Compel ¶ 2, at 1; ROA, Doc. 22, Order Granting Def.'s Mot. Summ. J. ¶ 2, at 1; ROA, Doc. 24, Tr. of Mot. to Settle Proceedings 2:24--3:5, Oct. 14, 2020.
[95] ROA, Doc. 23, Pls.' Mot. for New Trial 2.
[96] ROA, Doc. 25, Tr. of Proceedings 3:11--:13, Jan. 13, 2021; ROA, Doc. 26, Order Denying Motion for New Trial 1.
[97] Pet. in Error 2.
[98] Order Sheet 1, Mar. 17, 2021.
[99] COCA's Op. ¶ 1, at 2.
[100] See id. ¶ 21, at 10--11.
[101] See id. ¶ 24, at 12 (citing 12 O.S.2011, § 93(4); Pangaea Expl. Corp. v. Ryland, 2007 OK CIV APP 106, ¶¶ 11--12, 173 P.3d 108, 112).
[102] See id. ¶ 30, at 15.
[103] Id. ¶ 33, at 17.
[104] Id. ¶¶ 32--33, at 16--17.
[105] Id. ¶ 34, at 18.
[106] Id. ¶¶ 32--33, at 16--17.
[107] Id. ¶ 1, at 18 (Blackwell, J., dissenting).
[108] Id. (citing Arnold, 2021 OK 4, ¶ 13, 485 P.3d at 821).
[109] Id. ¶ 1 & n.1, at 19.
[110] Id. ¶ 2, at 19 (citing 12 O.S.2011, §§ 1141--1142 to demonstrate the distinction between actions to quiet title and actions to recover real property).
[111] Id. ¶ 2, at 20--21 (citing Hester, 1950 OK 131, ¶ 10, 218 P.2d at 643; Bd. of Cty. Comm'rs of Choctaw Cty. v. Schuessler, 1960 OK 252, ¶ 24, 358 P.2d 830, 835; Alfrey, 1951 OK 133, ¶ 0 (Syllabus # 4), 231 P.2d at 364; Paddyaker v. Griffith, 2011 OK CIV APP 97, ¶ 8, 260 P.3d 1276, 1278).
[112] Id. ¶ 2 n.3, at 21.
[113] Id. ¶ 30 n.5, at 15 (majority opinion).
[114] Id. ¶ 30 n.5, at 16 (quoting Wilson, 1913 OK 486, ¶ 13, 134 P. at 386).
[115] Appellants' Pet. for Writ of Cert. 2, 6, 10.
[116] Id. at 2, 6--7, 9--10.
[117] Id. at 2, 5--6, 10.
[118] Id. at 2--5, 10.
[119] For his part, Judge Blackwell's dissent states that, "[b]ecause the plaintiffs are ultimately seeking their share of proceeds from production, the applicable statute of limitations is five years from the date the claims accrued" and cites only 52 O.S.2011, § 570.14(D). COCA's Op. ¶ 2 n.3, at 21 n.3 (Blackwell, J., dissenting). He did not cite the Arnold case on this point, probably because Arnold did not discuss or cite the PRSA at all. Thus, it appears that Trustees misrepresent the basis for Judge Blackwell's conclusion that the 5-year statute of limitation, if any, should apply.
[120] See generally supra notes 35--41 and accompanying text for further discussion of these prelitigation letters.

KUEHN, J., with whom ROWE, V.C.J., joins, CONCURRING IN RESULT:
¶1 The Court of Civil Appeals (COCA) held that summary judgment was proper, mooting Petitioners' other claims. The Majority ultimately reaches the same conclusion. I would dismiss certiorari as improvidently granted, approve the COCA opinion for publication, and accord it precedential value because it succinctly shows how the outcome here is determined by established law.[1] 20 O.S. § 30.5; Supreme Court Rule 1.200(d).
FOOTNOTES
[1] COCA Op. at ¶31 (citing Scott v. Peters, 2016 OK 108, 388 P.3d 699 and Calvert v. Swinford, 2016 OK 100, 382 P.3d 1028). As the COCA explained, while Arnold v. Cabot Oil & Gas Corp., 2021 OK 4, 485 P.3d 817 involved markedly different facts, it is nevertheless premised on the idea that quiet-title actions are subject to 12 O.S. § 93(4). Id. at ¶¶9, 13, 15 (citing Scott and Calvert). Applying established precedent, the COCA (at ¶30 n. 5) also rejected the notion that equitable claims should be actionable in perpetuity. I find the Majority's opinion burdensome on unnecessary details and heavy-handed in its critique of Petitioners' counsel.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases

 
Cite
Name
Level

 
1950 OK CR 65, 218 P.2d 643, 91 Okl.Cr. 326, 
FRY v. STATE
Cited

Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2001 OK CIV APP 152, 37 P.3d 971, 73 OBJ 192, 
STATE ex. rel. CRAWFORD v. AMERICAN STANDARD LIFE INS. GUARANTY ASSN.
Discussed

 
2007 OK CIV APP 106, 173 P.3d 108, 
PANGAEA EXPLORATION CORPORATION v. RYLAND
Discussed at Length

 
2011 OK CIV APP 97, 260 P.3d 1276, 
PADDYAKER v. GRIFFITH
Discussed

 
2016 OK CIV APP 37, 379 P.3d 1157, 
CONCORDE RESOURCES CORP. v. WILLIAMS PRODUCTION MID-CONTINENT CO.
Cited

 
2019 OK CIV APP 37, 444 P.3d 501, 
HSBC v. TUGGLE
Cited

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1989 OK 168, 789 P.2d 1272, 60 OBJ 2358, 
Hull v. Sun Refining and Marketing Co.
Cited

 
1913 OK 486, 134 P. 382, 38 Okla. 498, 
WILSON 1. BOMBECK
Discussed at Length

 
1992 OK 119, 855 P.2d 597, 63 OBJ 2119, 
I.C. Gas Amcana, Inc. v. J.R. Hood
Discussed

 
1993 OK 85, 859 P.2d 1081, 64 OBJ 2009, 
Kluver v. Weatherford Hosp. Authority
Discussed

 
1993 OK 106, 859 P.2d 1088, 64 OBJ 2339, 
Atlantic Richfield Co. v. Tomlinson
Discussed at Length

 
1947 OK 269, 185 P.2d 189, 199 Okla. 230, 
DERUY v. NOAH
Discussed at Length

 
1994 OK 3, 867 P.2d 463, 65 OBJ 296, 
Crockett v. McKenzie
Discussed

 
1952 OK 171, 243 P.2d 701, 206 Okla 344, 
TURNER v. SOONER OIL & GAS CO.
Discussed

 
1952 OK 456, 257 P.2d 1058, 208 Okla 583, 
JENKINS v. FREDERICK
Discussed

 
1916 OK 608, 158 P. 615, 59 Okla. 105, 
VERNOR v. POORMAN
Discussed

 
1917 OK 208, 167 P. 468, 64 Okla. 249, 
BARKER v. CAMPBELL-RATCLIFF LAND CO.
Discussed

 
1956 OK 288, 303 P.2d 430, 
DOUGLASS v. MOUNCE
Discussed

 
1945 OK 303, 163 P.2d 539, 196 Okla. 140, 
DILLON v. HELM
Discussed

 
1959 OK 69, 341 P.2d 912, 
MALOY v. SMITH
Discussed at Length

 
1960 OK 205, 357 P.2d 425, 
NELSON v. DAUGHERTY
Discussed at Length

 
1960 OK 252, 358 P.2d 830, 
BOARD OF COUNTY COM'RS OF CHOCTAW CO v. SCHUESSLER
Discussed at Length

 
1999 OK 89, 998 P.2d 603, 70 OBJ 3342, 
Hall v. Globe Life & Accident Insurance Co. of Oklahoma
Discussed at Length

 
1964 OK 18, 389 P.2d 473, 
PHILLIPS v. THOMPSON
Discussed

 
1970 OK 161, 474 P.2d 950, 
MOHOMA OIL CO. v. AMBASSADOR OIL CORP.
Discussed

 
2004 OK 45, 92 P.3d 695, 
HOUGH v. HOUGH
Discussed

 
1996 OK 13, 911 P.2d 1205, 67 OBJ 529, 
Voiles v. Santa Fe Minerals, Inc.
Discussed at Length

 
2006 OK 43, 157 P.3d 100, 
REEDS v. WALKER
Discussed

 
1925 OK 199, 234 P. 747, 109 Okla. 13, 
WARNER v. MASON
Discussed

 
2016 OK 100, 382 P.3d 1028, 
CALVERT v. SWINFORD
Discussed at Length

 
2016 OK 108, 388 P.3d 699, 
SCOTT v. PETERS
Discussed at Length

 
1928 OK 576, 272 P. 878, 134 Okla. 63, 
WHITEHEAD v. BUNCH
Discussed

 
2020 OK 31, 467 P.3d 659, 
PAYNE v. KERNS
Cited

 
2021 OK 4, 485 P.3d 817, 
CLAUDE C. ARNOLD NON-OPERATED ROYALTY INTEREST PROPERTIES v. CABOT OIL & GAS CORP.
Discussed at Length

 
2021 OK 7, 481 P.3d 883, 
IN THE MATTER OF THE ASSESSMENTS FOR TAX YEAR 2012 OF CERTAIN PROPERTIES
Discussed

 
2023 OK 100, 
ULLMAN v. OKLAHOMA HIGHWAY PATROL
Cited

 
1927 OK 278, 259 P. 260, 126 Okla. 283, 
NATIONAL BANK OF CLAREMORE v. JEFFERIES
Discussed

 
1981 OK 134, 637 P.2d 81, 
Martin v. Chapel, Wilkinson, Riggs, and Abney
Discussed

 
1926 OK 246, 248 P. 329, 121 Okla. 135, 
GYPSY OIL CO. v. MARSH
Discussed

 
1951 OK 133, 231 P.2d 363, 204 Okla. 473, 
ALFREY v. RICHARDSON
Discussed at Length

 
1950 OK 131, 218 P.2d 641, 203 Okla. 97, 
HESTER v. WATTS
Discussed at Length

 
1949 OK 65, 206 P.2d 184, 201 Okla. 400, 
STATE ex rel. COM'RS OF LAND OFFICE v. REYNOLDS
Discussed

 
1949 OK 214, 219 P.2d 199, 203 Okla. 205, 
EASLEY v. ASHTON
Discussed

 
1998 OK 45, 961 P.2d 188, 69 OBJ 2127, 
PURCELL v. SANTE FE MINERALS, INC.
Discussed at Length

 
1999 OK 79, 989 P.2d 448, 70 OBJ 2752, 
Manley v. Brown
Discussed

 
1944 OK 316, 153 P.2d 486, 194 Okla. 519, 
FRANKLIN v. MARGAY OIL CORP.
Discussed

 
1942 OK 339, 130 P.2d 841, 191 Okla. 453, 
HARRISON v. EAVES
Discussed at Length

 
1984 OK 72, 689 P.2d 947, 
Daugherty v. Farmers Co-op. Ass'n
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 95, 
Limitation of Other Actions
Discussed at Length

 
12 O.S. 93, 
Limitation of Real Actions
Discussed at Length

 
12 O.S. 651, 
New Trial - Definition - Causes for
Cited

 
12 O.S. 1141, 
Action to Quiet Title - Joinder with Action for Possession - Adverse Interests
Cited

 
12 O.S. 1651, 
Determination of Rights, Status or Other Legal Relations - Exceptions
Cited

 
12 O.S. 2008, 
General Rules of Pleading
Cited

Title 20. Courts

 
Cite
Name
Level

 
20 O.S. 30.5, 
Opinions - Publications
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 540, 
Renumbered as 52 O.S. § 570.10 by Laws 1992, SB 168, c. 190, § 28
Cited

 
52 O.S. 570.1, 
Short Title
Discussed

 
52 O.S. 570.10, 
Proceeds from Sale of Production
Discussed

 
52 O.S. 570.14, 
Sole and Exclusive Jurisdiction of State - Rulemaking Power Granted to Corporation Commission - Owner Injury in Business or Property - Statute of Limitations
Discussed at Length

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA